# 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫

Virginia Brewing Company v. E. W. Webber.

September 11, 1936.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*Holman Willis,* for the plaintiff in error.

*Robert A. Fulwiler, Jr.,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The plaintiff in error is a Virginia corporation which issued and offered for sale its capital stock. Before selling any of its stock it was required to and did comply with the provisions of chapter 147A of the Code of Virginia, 1930 (section 3848 (47) et seq.) as amended, commonly known as the Blue Sky Law.

During the promotion period of its existence the Virginia Brewing Company was called the Shenandoah Brewing Company and in this name it was originally incorporated, but by charter amendment it became the Virginia Brewing Company.

The defendant in error, Webber, was a stock salesman and was licensed by the State Corporation Commission to sell the stock of the plaintiff in error.

The provisions of the law fixing the conditions of the stock subscriptions or stock sales were required to be strictly observed by the sales agent, the corporation and its officers.

The president of the corporation, during its promotion

period, was L. A. Scholz and its secretary and treasurer, who was in charge of stock sales, was E. E. Ernst.

The facts relating to the transaction which is the subject of this suit are substantially and briefly these:

That on April 10, 1934, Mr. Webber, the stock salesman referred to, concluded a contract of sale to one Phieffer of $5,500, of the stock of the corporation; that the contract was signed by Phieffer and the Shenandoah Brewing Company, Inc., by E. W. Webber, authorized and licensed representative. It was a printed contract, prescribed by section 3848 (51), clause (m), as amended by Acts 1934, chapter 341, and approved by the State Corporation Commission; that upon the execution of the contract the subscriber made no cash payment on his stock purchase but deposited with Scholz 200 shares of Standard Brands, Inc., stock, represented by two certificates. The contract bore at its top, the following notation: "Hold 30 days sale of stock." The two certificates of stock were worth at the time of the execution of the contract the sum of $4,200, but on November 8, 1934, by direction of Mr. Ernst, the secretary and treasurer of the corporation, the stock was by entry of the bookkeeper taken into the corporation as an asset at the sum of $3,600, that being its market value as of that date. Subsequently this credit entry was cancelled on the books of the corporation by the successor in office to Mr. Ernst.

The facts further are that Scholz, while still president of the corporation returned the two stock certificates to Phieffer, upon the advice of the attorney for the corporation; that before the stock was returned to him Phieffer had been noted present at a stockholders' meeting and voted the full amount of his subscription; that on January 5, 1933, Phieffer made a payment of $600 on the contract and on February 7, 1935, Mr. Ernst, acting as vice-president of the corporation, addressed a letter to Webber, the stock salesman, advancing the sum of $25, "against commission due you on the Phieffer sale, wish to advise you that this matter was taken up with the president and secretary of the corporation, and your request was granted"; that Webber was paid the sum of $72, on

account of commissions on the $600, payment made by Phieffer, which did not include the $25 advancement referred to, which was subsequently paid back to the corporation; that the corporation was never paid anything on the purchase price of the stock except the $600 referred to.

Webber instituted suit against the corporation by notice of motion for judgment for damages in the sum of $558, with interest, which represented the amount of his commissions on the stock subscription sale under the contract, less the sum of $97, which he had already received. There was a verdict in this suit by the jury for the full amount claimed by the plaintiff, which was sustained by the trial court.

It is also in evidence that the corporation made repeated demands on Phieffer for the amount of his subscription and that it brought suit against him on account thereof in June, 1935, which was pending at the time of the termination of the suit in judgment.

The contention of the plaintiff in error in the suit in judgment is that the defendant in error is not entitled to recover because the terms of the Blue Sky Law, contained in sections 3848 (47) to 3848 (66), inclusive, of the Code of Virginia of 1930, as amended, had not been complied with, in that the stock of the corporation purchased by Phieffer had not been paid for in actual money or at all; that the contract, made under the provisions of the statute, and approved by the State Corporation Commission, and assented to by the defendant in error by his becoming a party thereto, as required by the statute, expressly exacted such payment by its terms.

The plaintiff in error, defendant in the court below, made its defense by a motion to strike out the plaintiff's evidence and by offering an appropriate instruction. This motion was overruled and the instruction was refused.

The single issue, in our judgment, to be determined is whether or not the terms and provisions of the Blue Sky Law are to be adhered to and its integrity kept unimpaired.

Black's Law Dictionary, page 229, defines the term Blue Sky Law as follows:

"A popular name for acts providing for the regulation

and supervision of investment companies, for the protection of the community from investing in fraudulent companies. A law intended to stop the sale of stock in fly by night concerns * * * and other like fraudulent exploitations." *Brock* v. *Hines*, 97 Okl. 147, 223 P. 654, 656; *Dinsmore* v. *National Hardwood Co.*, 234 Mich. 436, 208 N. W. 701.

The contract which is involved here contains this provision:

"That the commission which the company has agreed to pay for the sale of its stock will be paid only as payments on account of subscriptions to such stock are unconditionally and irrevocably made in actual money; and the representative who takes this subscription expressly assents to this provision as to payment of commission."

Section 3848 (51), clause (m), is, in part, as follows:

"It shall be unlawful for any person or corporation to engage in selling, offering to sell or contracting to sell any security such as designated in section three of this act, * * * except by printed contract, the form of which shall be approved by the commission, * * * and it shall be unlawful for any corporate officer or other person in any capacity whatsoever to pay or issue or cause to be issued or paid for any such consideration, or as a bonus any money, stock or securities except as set forth in such subscription contract, * * * ."

Subsection 61 of the act (Code 1930, section 3848 (61)) provides that any person, as principal or otherwise, who shall commit in whole or in part any act declared unlawful by this act, shall be deemed guilty of a misdemeanor and on conviction, be punished by fine or imprisonment or both.

Subsection 66 of the act (Code 1930, section 3848 (66)) provides that it shall be remedial and shall be liberally construed to effect its manifest objects and purposes. *Troth* v. *Robertson*, 78 Va. 46; *Gobble* v. *Clinch Valley Lumber Co.*, 141 Va. 303, 127 S. E. 175; *Richardson* v. *Com.*, 131 Va. 802, 109 S. E. 460.

■ The object and purpose of the act was to suppress an existing and growing evil in this State. The investment market was flooded with stocks of little or no value and promoters

and stock salesmen, well versed in trade talk, preyed upon an unwary public by inducing it to purchase this character of stock.

The statute which was originally passed by the legislature of 1916 (Acts 1916, chapter 499), was strengthened in its strictness from time to time by amendment to its present form as quoted in part.

The manifest purpose and design was to correct the evil referred to, and one of the means to accomplish this end was to forbid the payment of commissions on "trade-in sales and uncollectible subscriptions."

This was the genesis of the contract and the statutory requirements relating thereto.

■■ To allow a recovery in a suit for damages or otherwise based on a contract which is contrary to the spirit, purpose and intendment of the statute would contravene the public policy of the State which is expressed by its statute.

"That which is plainly within the spirit, meaning and purpose of a remedial statute, though not therein expressed in terms, is as much a part of it as if it were so expressed." *Hasson* v. *Chester*, 67 W. Va. 278, 67 S. E. 731.

The above expressions reflect our judgment in the matter and it is therefore unnecessary to discuss the evidence or to note further the contentions of the defendant in error. We reverse the judgment of the trial court.

*Reversed.*