Present:  All the Justices

UNIVERSITY OF VIRGINIA HEALTH
SERVICES FOUNDATION, ET AL.

v.  Record No. 070214     OPINION BY JUSTICE DONALD W. LEMONS
                                    February 29, 2008
HUNTER MORRIS, AN INFANT, BY
HIS NEXT FRIENDS, ELIZABETH
PIERCE MORRIS, HIS MOTHER,
AND DAVID R. MORRIS, HIS
FATHER, ET AL.

        FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                    Edward L. Hogshire, Judge

STUART A. HOWARDS, M.D., ET AL.

v.  Record No. 070217

WILLARD A. SEARCY, AS
ADMINISTRATOR OF THE ESTATE OF
CARA LEIGH SEARCY, DECEASED,
ET AL.

        FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                    Edward L. Hogshire, Judge

CRYSTAL ANN MacARTHUR, A
MINOR, BY HER MOTHER AND NEXT
FRIEND, DEBORAH ANN YORK, ET
AL.

v.  Record No. 070475

UNIVERSITY OF VIRGINIA HEALTH
SERVICES FOUNDATION

        FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                    Randy I. Bellows, Judge Designate

    In these consolidated appeals, we consider whether the

University of Virginia Health Services Foundation ("HSF") is

entitled to charitable immunity.

I. FACTS AND PROCEEDINGS

A. Health Services Foundation

HSF is a "non-profit group practice health care provider organization" that employs the physicians who work at the University of Virginia School of Medicine ("Medical School"). The physicians who are employed by HSF are also employed by the Medical School. The physicians teach and perform research at the Medical School and render patient care services at the University of Virginia Medical Center ("Medical Center") and regional primary care offices. HSF bills patients for professional fees when the physicians treat patients.

1. Articles of Incorporation

HSF was created in 1979, primarily to improve the patient billing and collection process, which was previously performed by the University of Virginia (the "University"). The Articles of Incorporation of HSF state several purposes of the organization:

> Section 2. Purposes and Restrictions
>     (a) The purposes for which the Foundation is formed are exclusively charitable, scientific and educational, as contemplated by Section 501(c)(3) of the Internal Revenue Code of 1986, as amended . . . . More particularly, the Foundation is organized and shall at all times be operated to assist medical education by teaching in a group practice setting within the academic environment of the University of Virginia (herein the "University"), and, in particular, the University's Medical Center; to coordinate and deliver superior patient care

2

therein, and in connection therewith to perform a public trust without regard to the race, color, creed, sex, age or ability to pay of the patients so served; and in concert with the University:

> (i)  To provide hospital and medical care, education and research;

> (ii)   To assist and conduct programs to cure, alleviate, and prevent human illness and disease;

> (iii)   To provide teaching services on the undergraduate, post graduate and continuing education levels and to provide service generally to the various medical departments of the University's Medical Center;

> (iv) To assist and conduct programs of public charity to benefit patients who might not otherwise receive or be able to afford medical attention;

> (v)  In furtherance of the above stated purposes, to use and apply the whole or any part of the Foundation's income and principal exclusively for charitable, scientific or educational purposes;

> (vi) To engage in any and all lawful activities incidental to the foregoing purposes except as limited herein.

The Articles of Incorporation also state, "No part of the Foundation's net earnings shall inure to the benefit of a director or officer of the Foundation or to any private individual."  Upon dissolution of HSF, none of the property or proceeds of HSF may be distributed to officers or directors of HSF, or to any individual.

3

## 2. Providing Medical Care to Indigents

One of the purposes stated in HSF's Articles of Incorporation is "[t]o assist and conduct programs of public charity to benefit patients who might not otherwise receive or be able to afford medical attention."  In furtherance of this purpose, HSF provides medical care and treatment to all persons, regardless of their ability to pay or whether they have any outstanding debts to HSF.

When a patient presents at the Medical Center and is unable to pay for a service, front desk staff perform a "verbal mini-screening" to determine the patient's income and number of dependents.  The patient is given paperwork to complete so the Medical Center can review the patient's financial status.  If the Medical Center determines that the patient is unable to pay all or a portion of his bill, he is classified at one of five levels of "medical indigency."  If a patient is categorized as a "level one" (100% medically indigent), he is not charged for any of the services he receives from HSF physicians.  If a patient is classified at a lower level of medical indigency, anywhere from five to fifty-five percent of the charge for the services is adjusted.

If a medically indigent patient does not complete the financial paperwork, he is billed as a paying patient.  The patient may complete the paperwork during the billing and

collection process.  If the patient is then determined by HSF to be medically indigent, HSF makes a retroactive adjustment for the patient's entire account.

HSF regularly files warrants in debt in the appropriate general district court to obtain judgments against patients who have a balance on their account.  If HSF obtains a judgment against a medically indigent patient, the patient may still file the financial status paperwork.  If it is determined that the patient is medically indigent, a retroactive adjustment is made to the patient's account.

The current Chief Operating Officer of HSF, Bradley E. Haws ("Haws"), and the Director of Billing and Collections, Kevin M. Higgins, testified that HSF usually collects about 35-38% of "full bill charges" from a paying patient or insurance company because HSF has "agreements with third party payors that provide for payments to [HSF] at amounts different from its established rates."  HSF's financial statements show a loss of approximately $20-22 million a year in foregone collections for care provided to medically indigent patients. Because HSF would expect to actually receive only 35-38% of that amount if "collecting a typical amount," Haws testified that HSF actually failed to receive roughly $7-8 million in expected collections as a result of providing services to medically indigent patients in 2005.

The Commonwealth reimburses the Medical Center up to the level of the costs of treating many medically indigent patients. Haws testified that in 2005, "5 and a half million dollars was paid to the [M]edical [C]enter and then transferred to the faculty as compensation up to the level of cost for seeing [medically indigent patients]." Haws testified that HSF therefore had an actual shortfall of about $1.5 million for treating medically indigent patients in 2005 instead of the $20 million reflected on the financial statements.

3.   Flow of Money From HSF to Physicians

HSF, having been created for the purpose of conducting patient billing and collections, performs that function. HSF's revenue consists of its net patient service revenue ("estimated net realizable amounts from patients, third-party payors, and others for services rendered"), reimbursements from the University for supervisory, administrative, and clinical services provided to the Medical Center, investment income, gain on the sale of capital assets, and "other miscellaneous revenue." HSF receives no funds as contributions or donations because it is precluded from receiving contributions or donations under its affiliation agreement with the Medical School.

HSF distributes its revenue in the following manner: (1) HSF pays its operating expenses[1]; (2) 7% of gross revenue is then paid to the Dean of the Medical School (the "Dean's Tax") for an academic advancement fund; and (3) the balance is transferred to the various departments of the Medical School in accordance with how much revenue the departments generate.

The physicians are employed by both HSF and the Medical School.  A physician's salary is set by the Dean of the Medical School and the chair of the department for which that physician works.  The departments aggregate funds received from HSF and the Medical School and use them to pay the physicians' salaries and benefits.

The physicians' salaries consist of two components:  a guaranteed base salary, which is a fixed amount paid by the University and, in addition, an incentive payment[2] to the physicians from their respective departments.  When the two compensation components are combined, HSF physicians are compensated on average at about the forty-fifth to fifty-fifth percentile of salaries for physicians employed in academic

---

[1] HSF's operating expenses do not include salaries for physician employees.

[2] The plaintiffs in these cases refer to the non-fixed compensation as "bonuses," while HSF uses the term "incentive payments."  Regardless of the varying terminology, it is clear that all parties are referring to the portion of the HSF physicians' salaries that is not fixed, which we refer to in this opinion as "incentive payments."

medical centers, according to a survey conducted by the American Association of Medical Colleges ("AAMC"). HSF considers this level of income necessary to recruit and retain physicians.

### 4. Tax Classification

In 1980, HSF applied to the United States Internal Revenue Service ("IRS") for recognition of federal income tax exemption under I.R.C. § 501(c)(3). HSF requested a definitive ruling as to the non-private foundation status of HSF under I.R.C. § 509, applying as: (1) a hospital; (2) an organization "normally receiving not more than one-third of its support from gross investment income and more than one-third of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions" under § 509(a)(2); and (3) an organization "being operated solely for the benefit of or in connection with one or more of the organizations described . . . above" under § 509(a)(3). The IRS determined that HSF was exempt from federal income tax under § 501(c)(3), and further determined that HSF is a public charity (in other words, it is not a private foundation) because it is a § 509(a)(3) organization. HSF's tax-exempt status is based upon its function as a supporting organization of the University, which is a state agency. However, HSF presented expert testimony at the

hearing in <u>MacArthur</u> that the IRS's determination that HSF is a § 509(a)(3) organization does not mean that it would not have qualified as a § 509(a)(2) organization.

## B. Proceedings Below

### 1. <u>Howards v. Searcy</u> and <u>University of Virginia Health Services Foundation v. Morris</u>

Willard and Lisa Searcy (collectively, "Searcy"), as Administrators of the estate of their daughter, Cara Leigh Searcy ("Cara Leigh"), filed a motion for judgment against Dr. Stuart Howards ("Dr. Howards") and Dr. Carl Lynch ("Dr. Lynch") in the Circuit Court of the City of Charlottesville. Searcy alleged that Dr. Howards and Dr. Lynch, who were employees of HSF, acted negligently in commencing surgery on Cara Leigh without reviewing a laboratory analysis of her blood. Searcy alleged that as a direct and proximate cause of Dr. Howards' and Dr. Lynch's negligence, Cara Leigh died. Dr. Howards and Dr. Lynch jointly filed a special plea of charitable immunity.

Hunter Morris ("Morris"), by his next friends and parents Elizabeth and David Morris, filed a motion for judgment against HSF, Dr. Jennifer Wenger ("Dr. Wenger"), Dr. Barbara Head ("Dr. Head"), and Dr. James Ferguson ("Dr. Ferguson") jointly and severally in the Circuit Court of the City of Charlottesville. Dr. Wenger, Dr. Head, and Dr. Ferguson were

physicians employed by HSF.  Morris alleged that Dr. Wenger, Dr. Head, and Dr. Ferguson negligently failed to deliver Morris before he suffered irreversible brain damage in utero. Morris alleged that as a direct result of their negligence, he suffers from cerebral palsy, mixed, spastic quadriplegia with dystonia, sensorineural hearing loss, and developmental delay. Additionally, Morris alleged that HSF was vicariously liable for the negligence of Dr. Wenger, Dr. Head, and Dr. Ferguson. HSF, Dr. Wenger, Dr. Head, and Dr. Ferguson jointly filed special pleas of charitable immunity.

Judge Edward L. Hogshire ordered that the special pleas in Searcy's and Morris's cases be heard at a consolidated hearing.[3]  Judge Hogshire held that HSF does not qualify for charitable immunity and denied the defendants' special pleas in both cases.  HSF appeals Judge Hogshire's interlocutory order denying its special pleas in Morris v. HSF and Howards v. Searcy to this Court pursuant to Code § 8.01-670.1 on five assignments of error:

1. The trial court erred by extending the application of Va. Code § 8.01-38 to support its decision to deny HSF charitable immunity.

2. The trial court improperly created and applied a beneficiary focused "balancing test" which does not apply

---

[3] The hearing also addressed the special plea filed in Ringheim v. University of Virginia Health Services Foundation, et al., a case that is not before us on appeal.

10

to whether HSF is a charitable organization under Virginia law.

3. The trial court erred by focusing on physician compensation, which has no place in the analysis of whether HSF is a charitable organization or operates consistent with its charitable purpose.

4. The trial court erred by misapplying the ten factors listed in Ola [v. YMCA of South Hampton Roads, Inc., 270 Va. 550, 621 S.E.2d 70 (2005)] and, as a result, finding that HSF did not operate consistent with its acknowledged charitable purposes.

5. The trial court erred by denying the appellants' Plea of Charitable Immunity.

## 2. MacArthur v. University of Virginia Health Services Foundation

Crystal Ann MacArthur ("MacArthur"), by her next friend Deborah Ann York, filed a motion for judgment against HSF in the Circuit Court of the City of Charlottesville. MacArthur alleged that physicians employed by HSF negligently delayed emergency surgery to treat her shunt malfunction. MacArthur alleged that as a direct and proximate result of the physicians' negligence, she suffered permanent vision loss. Additionally, MacArthur alleged that HSF was vicariously liable for the individual physicians' negligence. HSF filed a special plea of charitable immunity. Judge Randy I. Bellows held that HSF enjoys charitable immunity and sustained HSF's special plea.

MacArthur appeals Judge Bellow's grant of HSF's special plea and dismissal of the case to this Court pursuant to Code

11

§ 8.01-670 on one assignment of error: "The trial court erroneously sustained the foundation's plea of charitable immunity and dismissed this action."

II.  Analysis

A.  Code § 8.01-38

"The doctrine of charitable immunity 'is firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State.' " Ola, 270 Va. at 555, 621 S.E.2d at 72 (quoting Memorial Hosp. v. Oakes, 200 Va. 878, 889, 108 S.E.2d 388, 396 (1959)).  Our previous discussions of charitable immunity have grounded the doctrine in part in the "public policy that the resources of charitable institutions are better used to further the institution's charitable purposes, than to pay tort claims lodged by the charity's beneficiaries." Id.  Additionally, we have upheld the doctrine of charitable immunity so as to preserve the spirit and intent of philanthropic gifts made by the public to charitable institutions and so that "that much of the burden [borne by those gifts will not be] again cast upon the public."  Hill v. Leigh Mem'l Hosp., Inc., 204 Va. 501, 507, 132 S.E.2d 411, 415 (1963).

The doctrine of charitable immunity in Virginia is limited.  A charitable institution is immune from liability to beneficiaries for acts of ordinary negligence by its servants

12

or agents, but may be liable for ordinary negligence in the selection and retention of its servants or agents.  Bailey v. Lancaster Ruritan Rec. Ctr., Inc., 256 Va. 221, 224, 504 S.E.2d 621, 622 (1998).  Charitable immunity applies only to claims of negligence asserted by those who accept the charitable institution's benefits.  A charitable institution is not immune from liability to invitees or strangers with no beneficial relationship to the institution.  Thrasher v. Winand, 239 Va. 338, 340-41, 389 S.E.2d 699, 701 (1990).  A charitable institution is not immune for acts of gross negligence or willful or wanton negligence, as "such conduct can never be characterized as an attempt . . . to carry out the mission of the charity to serve its beneficiaries."  Cowan v. Hospice Support Care, Inc., 268 Va. 482, 488, 603 S.E.2d 916, 919 (2004).

In addition to the judicial limitations on charitable immunity, the General Assembly has limited charitable immunity in certain instances.  One such limitation is Code § 8.01-38, which denies charitable immunity to most hospitals:

> Hospital as referred to in this section shall include any institution within the definition of hospital in § 32.1-123.

> No hospital, as defined in this section, shall be immune from liability for negligence or any other tort on the ground that it is a charitable institution unless (i) such hospital renders exclusively charitable medical services

13

for which service no bill for service is rendered to, nor any charge is ever made to the patient or (ii) the party alleging such negligence or other tort was accepted as a patient by such institution under an express written agreement executed by the hospital and delivered at the time of admission to the patient or the person admitting such patient providing that all medical services furnished such patient are to be supplied on a charitable basis without financial liability to the patient. . . .

Code § 8.01-38. Code § 32.1-123 defines "hospital" as follows:

"Hospital" means any facility licensed pursuant to this article in which the primary function is the provision of diagnosis, of treatment, and of medical and nursing services, surgical or nonsurgical, for two or more nonrelated individuals, including hospitals known by varying nomenclature or designation such as sanatoriums, sanitariums and general, acute, rehabilitation, chronic disease, short-term, long-term, outpatient surgical, and inpatient or outpatient maternity hospitals.

Code § 32.1-123.

Whether HSF is a hospital within the meaning of Code §§ 8.01-38 and 32.1-123 is a mixed question of law and fact. The Court reviews this issue de novo. See Uninsured Employer's Fund v. Gabriel, 272 Va. 659, 662-63, 636 S.E.2d 408, 411 (2006). Code § 8.01-38 is in derogation of the common law of charitable immunity and must be "strictly construed and not . . . enlarged in [its] operation by

14

construction beyond [its] express terms." Schwartz v. Brownlee, 253 Va. 159, 166, 482 S.E.2d 827, 831 (1997).

HSF does not fall under Code §§ 8.01-38 and 32.1-123. Code § 32.1-123 includes in the definition of "hospital" only "facilit[ies] licensed pursuant to this article . . . ." HSF is not licensed pursuant to Code § 32.1-123 et seq. ("Hospital and Nursing Home Licensure and Inspection"). HSF is not currently licensed to operate as a hospital. From its inception, HSF has never applied for or held a license to operate as a hospital or been subject to any type of hospital accreditation.

Because HSF does not come within the definition of "hospital" in Code § 32.1-123, it does not fall within the scope of Code § 8.01-38's denial of charitable immunity to hospitals. The Morris and Howards appellants argue that the trial court erroneously extended the application of Code § 8.01-38 to deny charitable immunity to HSF. The trial court noted that

> [a]lthough the statute does not include medical foundations when defining hospitals, it clearly expresses the legislative policy to limit charitable immunity in the traditional halls of medicine, and no distinguishing factor suggests a more generous approach to medical foundations that engage in the same activities and hire the same physicians as hospitals.

15

This comment by the trial court does not extend the application of Code § 8.01-38 to medical foundations, but only noted the legislative intent behind the statute as further support for his application of the Ola factors to HSF.

## B. The Ola Test

Whether HSF is eligible for common law charitable immunity from tort liability is a mixed question of law and fact that is reviewed de novo. This Court recently articulated the test for charitable immunity in Ola v. YMCA of South Hampton Roads, Inc.:

> To establish charitable immunity as a bar to tort liability, an entity must prove at least two distinct elements. The absence of either element makes the bar of charitable immunity inapplicable. First, the entity must show it is organized with a recognized charitable purpose and that it operates in fact in accord with that purpose. In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose.

> Second, assuming the entity has met the foregoing test, it must then establish that the tort claimant was a beneficiary of the charitable institution at the time of the alleged injury.

Ola, 270 Va. at 556, 621 S.E.2d at 72-73 (internal citations and quotations omitted). For the first element,

> [i]f an organization's charter sets forth a charitable or eleemosynary purpose, there is a

16

> rebuttable presumption it operates as a
> charitable institution in accordance with that
> purpose.  However, if the manner in which the
> organization actually conducts its affairs is
> not in accord with the charitable purpose, then
> the presumption may be rebutted and the bar of
> charitable immunity does not apply.

Id. at 557, 621 S.E.2d at 73 (internal citations omitted).  We articulated ten factors that are indicative of whether a charitable organization operates in fact with a charitable purpose:

> (1) Does the entity's charter limit the entity
> to a charitable or eleemosynary purpose?
> (2) Does the entity's charter contain a not-
> for-profit limitation?
> (3) Is the entity's financial purpose to break
> even or earn a profit?
> (4) Does the entity in fact earn a profit, and
> if so, how often does that occur?
> (5) If the entity earns a profit (a surplus
> beyond expenses) must that be used for a
> charitable purpose?
> (6) Does the entity depend on contributions and
> donations for a substantial portion of its
> existence?
> (7) Is the entity exempt from federal income
> tax and/or local real estate tax?
> (8) Does the entity's provision of services
> take into consideration a person's ability to
> pay for such services?
> (9) Does the entity have stockholders or others
> with an equity stake in its capital?
> (10) Are the directors and officers of the
> entity compensated and if so, on what basis?

Id. at 557 n.1, 621 S.E.2d at 73 n.1 (internal citations omitted). The factors are not exclusive, and no one factor is determinative. Id. at 557, 621 S.E.2d at 73.[4]

1. Presumption that HSF Operates With a Charitable Purpose

HSF is entitled to a presumption that it operates as a charitable institution in accordance with the purposes set out in its Articles of Incorporation. The HSF Articles of Incorporation state: "The purposes for which the Foundation is formed are exclusively charitable, scientific and educational, as contemplated by Section 501(c)(3) of the Internal Revenue Code of 1986, as amended." This is similar to the language in the YMCA's articles of incorporation that we found in Ola to create a rebuttable presumption that the YMCA was a charitable organization: "Article II(A) mandates that the YMCA 'shall be operated exclusively for one or more charitable, religious, educational and scientific purposes.' " Id. at 559, 621 S.E.2d at 74. The HSF Articles of Incorporation established the rebuttable presumption that it is a charitable

---

[4] The Morris and Howards Appellants argue in assignment of error 2 that the trial court improperly created and applied a "beneficiary focused balancing test" to HSF. The trial court noted that "[t]he closing inquiries of Ola probe the charitableness of an organization by asking whether it primarily benefits those who run it or those it serves." In doing so, the trial court did not create or apply a beneficiary-focused balancing test, but summarized the Ola factors it had previously discussed, finding that the structure of HSF most benefits those with a financial stake in HSF: the physicians employed by HSF.

18

organization.  The plaintiffs in the respective cases then had the burden of rebutting the presumption.  Id. at 561, 621 S.E.2d at 75.

### 2.    Rebuttal of Presumption

Though entitled to the presumption, "[i]f the manner in which [HSF] actually conducts its affairs is not in accord with the charitable purpose, then the presumption may be rebutted and the bar of charitable immunity does not apply." Id. at 557, 621 S.E.2d at 73.  In Ola, we articulated ten factors that are indicative of whether an organization operates in fact with a charitable purpose.  The factors "are not exclusive and the presence or absence of any particular factor is not determinative."  Id.  The Morris and Howards appellants argue in assignment of error 4 that the trial court misapplied the Ola factors to find that HSF does not operate as a charitable institution.

"In the final analysis, whether an entity operates as a charity turns on the facts of each case . . . ."  Id.  In this case, we find the following four factors determinative of the conclusion that HSF does not operate in fact with a charitable purpose: (a) HSF was created to correct billing and collection problems; (b) the ratio of HSF's revenue compared to the cost of its charitable work is substantially disproportionate; (c) HSF's incentive payment structure is functionally a profit-

19

based bonus system, much like a for-profit enterprise; and (d) HSF does not accept charitable gifts.

### (a)  Creation of HSF

The founding Chief Executive Officer of HSF, William Edgar Carter, Jr., testified that a primary reason for the creation of HSF was to improve the billing system that was used to collect fees for the clinical services of the physicians employed by the Medical School.  The billing system used at the time was inadequate, such that not enough money was being collected and not enough revenue was returned to the Medical School.  HSF's primary goal at inception was to find, set up, and operate a new billing system to collect more of the receivables generated by providing patient care.

The record reflects that the HSF Billings and Collections Department employs 115 people.  Of those people, five full-time employees (four collectors and one clerical employee) are involved in the legal collection unit.  In addition, HSF contracts with an attorney that represents HSF if it goes to trial for collections purposes.

Once a week, a representative from the legal collection unit goes to the Charlottesville General District Court to file warrants in debt.  From 2001 to 2005, HSF filed 16,158 warrants in debt and obtained 5,885 judgments.  In those years, HSF sought $124,108,445 and collected $7,009,718

20

through these efforts. HSF expended an estimated 45,760 employment hours in "efforts to obtain legal collection of payment[s] on behalf of HSF" between 2001 and 2005.

HSF was created to increase the amount of revenue received by the Medical Center and aggressively pursues legal collections. The magnitude of these practices suggests that HSF operates more like a for-profit business with a financial purpose of earning a profit than a charitable organization.

(b) Ratio of Revenue to Cost of Charitable Work

In 2005, HSF's total revenue from billing for patient services, reimbursements from the University for services provided to the Medical Center, and "other miscellaneous revenue" was $216,780,000, with additional income from investments and gains from sales of capital assets of $9,118,000. HSF's financial statements show foregone collections of approximately $22.5 million in 2005 as a result of providing medical care to indigent patients. Haws testified that this figure reflects the amount that would have been billed if collection efforts had not been waived for indigency. However, Haws testified that HSF usually collects only about thirty-five to thirty-eight percent of the amount billed from insurance companies and paying patients. Therefore, by treating medically indigent patients in 2005,

21

HSF actually failed to receive approximately $7-8 million in collections.

Moreover, the Commonwealth reimburses the University up to the level of the costs of treating indigent patients. In 2005, the Commonwealth reimbursed the University $5.5 million, which was transferred to the faculty (the physicians employed by HSF) as compensation. Taking into account the Commonwealth's reimbursement, Haws testified that HSF's actual shortfall in 2005 was only about $1.5 million as a result of providing medical care to indigent patients. The ratio of this shortfall to HSF's total revenue and other income of $225,898,000 in 2005 is only about 0.66%. The minimal cost of HSF's charity work as compared to its income illustrates how small a portion of HSF's work is charitable.

(c) Physician Incentive Payments

The Morris and Howards appellants argue in assignment of error 3 that the trial court erred by focusing on physician compensation, which is not a factor under Ola. The trial court in these cases was concerned with the manner in which HSF's surplus is distributed. The trial court found that the incentive payment system, by which a large part of HSF's revenue is distributed to its physician employees, was "diametrically opposed" to the model of how a charitable institution uses its profit or surplus. HSF's method of

22

revenue distribution, not the amount, was the subject of the trial court's analysis. This analysis is clearly relevant to whether an institution operates in accordance with its stated charitable purpose. Ola, 270 Va. at 562, 621 S.E.2d at 76.

After HSF pays its operating expenses and the Dean's Tax, the balance of HSF's revenue is transferred to the various departments of the Medical School, depending on which departments generate the revenue. The departments group this revenue with money from the Medical School and use it to pay physician salaries and benefits. A department may then pay out incentive payments to the physicians who work for the department.

HSF spends an average of $12 to 17 million a year in incentive payments. When the incentive payments are added to the fixed compensation paid to the physicians, the physicians are compensated on average at about the forty-fifth to fifty-fifth percentile of the AAMC survey of salaries for physicians employed in academic medical centers. We recognize that this level of payment is necessary to recruit and retain talented physicians. The Medical Center is a world-class medical facility, in large part because of the high quality of the physicians employed by HSF. However, what is important to this analysis is not the reason the physicians are paid at a certain level or whether it is necessary to recruit and retain

23

physicians, but how HSF uses its substantial revenue, including its surplus.  See Ola, 270 Va. at 562, 621 S.E.2d at 76.

HSF's incentive payment structure includes a distribution of surplus revenue in a manner more consistent with a successful commercial business than a charitable organization. The revenue is distributed by HSF to the Medical Center departments in accordance with how much revenue those departments generated, rather than how much indigent care is provided, how much research is performed, or how many hours their physicians spent teaching.  The departments then distribute the incentive payments as determined by the chair of the department and the Dean of the Medical School. Surgical departments (plastic surgery, cardiovascular surgery, general surgery, and neurological surgery) tend to generate more revenue than other departments, such as pediatrics or psychiatry, because they perform procedures that are highly compensated.  The surgical departments receive more revenue from HSF, and the physicians who work for those departments tend to receive the biggest incentive payments.  For example, the Chair of the Department of Surgery, who also served on the HSF Board of Directors, received incentive payments, in addition to a base salary provided by the Medical School, between $430,000 and $600,000 a year from 2002 to 2005.  In

24

comparison, the Chair of the Department of Internal Medicine, who also served on the HSF Board of Directors, received incentive payments between $10,000 and $15,000 a year from 2003 to 2005.

The HSF incentive payment structure is functionally a profit-based bonus system. The departments that generate the most revenue receive the most money from HSF, and those physicians who are the most financially productive in their departments generally receive the biggest incentive payments. In this respect, HSF follows the model of a profitable commercial business, not a charitable institution.

### (d) No Charitable Gifts

HSF receives no charitable contributions or donations. In fact, under its affiliation agreement with the Medical School, HSF is precluded from receiving contributions or donations.

Because charitable immunity in Virginia is based on public policy, this factor is not without importance. We have justified granting charitable immunity to a charitable hospital in the past, saying:

> It cannot be debated that the care of the sick
> and injured is a public purpose, a matter of
> public concern. When a portion of the
> responsibility therefor is borne by the gifts
> of the philanthropic-minded, so much of the
> burden is removed from the public. If a
> portion of those gifts is diverted to the

> payment of tort claims, without restriction,
> the spirit and intent of the gifts are, at
> once, nullified and that much of the burden is
> again cast upon the public.

Hill, 204 Va. at 507, 132 S.E.2d at 415.  If HSF is required

to pay tort awards to the various plaintiffs in the present

cases, no philanthropic-minded intentions will be nullified,

because no gifts are received.

Whether or not an organization accepts charitable gifts

is not dispositive of whether that organization is entitled to

charitable immunity.  We recognize that there are some

charitable organizations that do not receive or accept

donations, particularly if they are previously endowed from a

philanthropic gift.  Cf. George v. Jefferson Hosp. Ass'n,

Inc., 987 S.W.2d 710, 714 (Ark. 1999) ("[A] modern hospital,

with rare exception, would find it extremely difficult to

operate wholly or predominately on charitable donations. . . .

[The hospital's] financial and organizational structure

[meeting only six percent of its financial obligations by

donations] do not negate its overriding charitable purpose.").

These organizations may still be entitled to charitable

immunity for other reasons.  See, e.g., Auerbach v. Jersey

Wahoos Swim Club, 846 A.2d 646, 650 (N.J. Super. Ct. App. Div.

2004) (finding that swim club's lack of funding from

contributions, gifts, grants, and donations was irrelevant

under N.J. Charitable Immunity Act because club was organized for exclusively educational purposes).  HSF, however, is clearly not dependent on philanthropic gifts, nor is it in a position of need.

### III. Conclusion

When the previously discussed four factors are considered in the context of the Ola factors, it is clear that the manner in which HSF actually conducts its affairs is not in accord with the charitable purpose stated in its Articles of Incorporation.  HSF operates like a profitable commercial business with extensive revenue and assets.  That portion of HSF's services providing quality medical care to medically indigent patients is commendable.  However, when an organization is operated "in a manner calculated to produce a profit or gain," it is not entitled to charitable immunity. Purcell v. Mary Washington Hosp. Ass'n, Inc., 217 Va. 776, 781, 232 S.E.2d 902, 905 (1977).  HSF is therefore not immune from tort liability under the doctrine of charitable immunity.

Accordingly, the orders of the trial court denying the special plea of charitable immunity in University of Virginia Health Services Foundation v. Morris and Howards v. Searcy are affirmed, and those cases are remanded for further proceedings consistent with this opinion.  For the same reasons, the judgment of the trial court in MacArthur v. University of

27

<u>Virginia Health Services Foundation</u> is reversed, and the case is remanded for further proceedings consistent with this opinion.

<u>Record No. 070214 – Affirmed and remanded.</u>
<u>Record No. 070217 – Affirmed and remanded.</u>
<u>Record No. 070475 – Reversed and remanded.</u>