Present:  All the Justices

JOHN EDWARD ANDREWS

v.  Record No. 071079      OPINION BY JUSTICE DONALD W. LEMONS
                                          June 6, 2008
MICHAEL S. BROWNE, ET AL.

          FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                   Leroy F. Millette, Jr., Judge

     In this appeal, we consider whether a transaction in

which 100% of the stock of a closely held corporation was

transferred to a group of three purchasers is regulated by the

Virginia Securities Act, Code § 13.1-501 et seq.

                    I.  Facts and Proceedings Below

     Before August 31, 2004, Michael Browne ("Browne") and

James Stein ("J. Stein") were the sole shareholders of the

Manassas Health Club, Inc. ("MHCI").  MHCI operated a health

club facility in Prince William County.  John Edward Andrews

("Andrews"), a patron of MHCI, expressed an interest in buying

MHCI from Browne and J. Stein.  Browne and J. Stein provided

Andrews with a document entitled "Manassas Income & Expense

Report" ("the Report"), containing financial information

regarding the operations of MHCI.  The Report was prepared by

Tina Stein ("T. Stein"), J. Stein's wife, who was responsible

for MHCI's bookkeeping.

     Relying on the information in the Report, Andrews,

Christopher Pownall (an MHCI employee), and Richard Pownall

(collectively "the Purchasers") decided to purchase MHCI. They entered into a "Stock Purchase Agreement" ("SPA") with Browne and J. Stein (collectively "the Sellers") under which they agreed to pay $500,000 in exchange for all 2,000 shares of MHCI stock. The Purchasers also agreed to "assume all liabilities and obligations of the Corporation, including, but not limited to, leases, build out, and any outstanding bonds and payroll that was incurred by the Corporation prior to the date of closing, in the ordinary course of business," and to "indemnify Sellers against all liabilities and obligations related to the Corporation or this transaction except as described [in the SPA]." The sale price was to be paid by transferring $200,000 cash to the Sellers at closing and a $300,000 note (the "Note") to the Sellers payable over 60 months. The SPA did not specify how the 2,000 shares were to be divided by the Purchasers. The "stock certificates, documents, and monies" were to be "held in escrow by Lawrence E. Fischer, Attorney at Law[,] until conditions precedent to closing [were] fully satisfied and all the terms and conditions of the Note [had] been fulfilled in his sole discretion."

Under the SPA, the Purchasers retained the exclusive right to vote the stock as long as there were no breaches of the SPA. The Purchasers agreed not to "sell, transfer, assign

for whatever reason, gift or transfer with or without consideration any shares of their stock in the Corporation to another individual or entity until such time as the aforesaid Note is satisfied in full, without first obtaining the written consent of the Sellers."

The Sellers and Purchasers entered into the transaction on August 31, 2004. After the transaction closed, Browne, J. Stein, and T. Stein gave Andrews a computer disc containing the income history of MHCI. The defendants told Andrews the disc was "too damaged to be accessed." Andrews was able to access the disc, which contained different information than what was in the Report provided to him before the closing.

In March 2005, Andrews, with the consent of the Sellers, bought Christopher Pownall's and Richard Pownall's interest in the MHCI stock. Andrews was then the sole shareholder of MHCI.

On February 2, 2007, Andrews filed a second amended complaint against the defendants, alleging that the Report prepared by T. Stein and provided to Andrews by Browne and J. Stein contained materially false information. Specifically, Andrews alleged that the Report deliberately understated the expenses and overstated the income of MHCI. Andrews also alleged that the defendants made various untrue statements of fact prior to the purchase regarding the number of members

MHCI had, MHCI's assets and debts, and whether MHCI's tax returns had been filed and its taxes paid when due.  Andrews alleged that if he had known these facts prior to the purchase of the MHCI stock, it would have "significantly impacted [his] deliberations on whether or not to purchase the corporation."  Andrews sought judgment against Browne and J. Stein under Code § 13.1-522 for making untrue statements of material fact and omitting material facts in furtherance of the sale of a security.  Andrews also sought judgment against all three defendants for actual fraud and common law civil conspiracy, and against Browne and J. Stein for breach of contract.

The defendants moved for partial summary judgment concerning count one of Andrews' complaint in part on the grounds that Code § 13.1-522, a provision of the Virginia Securities Act, "is not intended to protect active purchasers of a business."  After a hearing on defendants' motion for summary judgment, the trial court held that "the terms of the contract show [that the transaction was] a sale of business, and . . . that the Virginia Securities Act is not intended to protect the transaction herein under the facts and circumstances of this case."  The trial court entered an order on March 16, 2007, granting partial summary judgment and dismissing count one of Andrews' complaint.  Andrews nonsuited his remaining claims pursuant to Code § 8.01-380.  Andrews

4

appeals the trial court's March 16, 2007 order granting partial summary judgment on four assignments of error:

1.  The Court erred in its conclusion that the securities sold in this transaction did not have the traditional characteristics of stock.

2.  The Court erred in determining that the "sale of business" doctrine was applicable to this stock transaction.

3.  The Court erred by failing to apply the plain language of the Virginia Securities Act.

4.  The Court erred by ignoring material facts in dispute and applied the incorrect standard for granting Summary Judgment.

## II.  Analysis

Whether the MHCI stock transferred in this case is a "security" within the meaning of the Virginia Securities Act is a mixed question of law and fact, which we review de novo. University of Va. Health Servs. Found. v. Morris, 275 Va. 319, 332, 657 S.E.2d 512, 518 (2008).

### A. Similarity to Federal Securities Acts

The Virginia Securities Act defines "security" as follows:

> "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certification of subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; oil, gas or other mineral lease, right or royalty, or any interest therein; or, in general, any interest or instrument commonly

5

known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. . . .

Code § 13.1-501.  This definition of "security" derives almost verbatim from the definition of "security" in the federal Securities Act of 1933 ("1933 Act").  George D. Gibson, The Virginia Corporation Law of 1956, 42 Va. L. Rev. 445, 483 (1956).  The definition of "security" in the federal Securities Act of 1933, 15 U.S.C. § 77b(a)(1) (2000 & Supp. V 2005), is "virtually identical" to the definition of "security" in the federal Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78c(a)(10) (2000 & Supp. V 2005), and is treated as such for purposes of determining the scope of the term "security."  Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 n.1 (1985).

The Virginia Securities Act, the 1933 Act, and the 1934 Act, are all intended to protect investors from fraud in the investment market.  See Gurley v. Documation, Inc., 674 F.2d 253, 259 (4th Cir. 1982) ("Virginia's blue sky law shares with § 10(b) of the 1934 Act the central purpose of protecting investors from fraud in the securities markets.").  "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market."

6

United Housing Found., Inc. v. Forman, 421 U.S. 837, 849

(1975).  Similarly,

> [t]he object and purpose of [Virginia blue sky
> laws is] to suppress an existing and growing
> evil in this State.  The investment market was
> flooded with stocks of little or no value and
> promoters and stock salesmen, well versed in
> trade talk, preyed upon an unwary public by
> inducing it to purchase this character of
> stock.

Virginia Brewing Co. v. Webber, 167 Va. 67, 71-72, 187 S.E.

447, 449 (1936)) (interpreting the Securities Act of 1928,

which was replaced by the current Virginia Securities Act in

1956).  The Virginia Securities Act, the 1933 Act, and the

1934 Act "achieve their ends in similar ways: the disclosure

of material information concerning issuers of stock and the

regulation of sellers of securities."  Pollok v. Commonwealth,

217 Va. 411, 413, 229 S.E.2d 858, 860 (1976).  In light of

these parallels, we have previously held that the Virginia

Securities Act should receive "similar construction" as the

1933 and 1934 Acts.  Id.  When engaged in interpretation of a

term used in the Virginia Securities Act, it is appropriate to

look to the federal courts' interpretation of the same term in

the context of the 1933 and 1934 Acts.  See Tanner v. State

Corp. Comm'n, 266 Va. 170, 172, 580 S.E.2d 850, 852 (2003).

We have not previously addressed the use of the word

"stock" as part of the definition of "security" in Code

7

§ 13.1-501. We will therefore look to federal interpretation of the word "stock" as part of the definition of "security" in the 1933 and 1934 Acts.

### B. Federal "Economic Reality" Test

Both the federal Acts and the Virginia Securities Act define "security" to include, "unless the context otherwise requires," "any . . . stock." Code § 13.1-501, 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 78c(a)(10). In interpreting the term "security" in the 1933 and 1934 Acts, the United States Supreme Court has repeatedly stated that "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336 (1967); see also Securities & Exch. Comm'n v. W.J. Howey Co., 328 U.S. 293, 298 (1946).

In the context of "stock," the United States Supreme Court has rejected the suggestion that a transaction is regulated by the 1933 and 1934 Acts simply because the transaction is evidenced by the sale of an instrument called "stock." Forman, 421 U.S. at 848. Noting that "[t]he focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors," the Court held that an instrument may

be "stock," and therefore "within the letter of the [1933 and 1934 Acts,] yet not within the [Acts] because not within [their] spirit, nor within the intention of [their] makers." Id. at 849.  The Court further noted in Landreth that where an instrument called "stock" is exchanged, there "is no need . . . to look beyond the characteristics of the instrument to determine whether the Acts apply."  471 U.S. at 690.

Rather than apply a "plain language" approach to the 1933 and 1934 Acts, the United States Supreme Court applies an "economic reality test."  In Forman, the Court identified five common features of traditional stock: (1) the right to receive dividends contingent upon an apportionment of profits; (2) negotiability; (3) ability to be pledged or hypothecated; (4) conferring of voting rights in proportion to the number of shares owned; and (5) ability to appreciate in value.  421 U.S. at 851.  The Court reasoned that in some instances, the use of the traditional name "stock" was likely to "lead a purchaser justifiably to assume that the federal securities laws apply."  Id. at 850.  This is most likely when the instrument exchanged in the underlying transaction possessed some of the five common features of traditional stock.  Id. at 851.  The touchstone of the analysis is "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial

or managerial efforts of others." Id. at 852. Under this test, if "the investor is 'attracted [to a purchase] solely by the prospects of a return' on his investment," the underlying "stock" is more likely to be a security; the 1933 and 1934 Act would then apply. Id. (quoting Howey, 328 U.S. at 300). "By contrast, when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply." Id. at 852-53.

C. "Sale of Business" Doctrine

Following the Supreme Court's decision in Forman, some federal courts applied the Court's reasoning from Forman to exclude from coverage under the 1933 and 1934 Acts transactions in which 100% of the stock of a business was sold. See, e.g., Chandler v. KEW, Inc., 691 F.2d 443, 444 (10th Cir. 1977) (holding that the federal securities law did not apply because the economic reality of the transaction was that the purchaser was receiving 100% of the stock of the company); Bula v. Mansfield, [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,964 (D. Colo. May 13, 1977) (holding that the sale of "stock" does not transform the purchase of a business into a security transaction). These courts declined to apply the 1933 and 1934 Acts when a purchaser sought to acquire a business in its entirety. In such cases, the "stock" that was exchanged in the transaction was considered

10

to be only a method of vesting ownership of the business, and was "passed incidentally as an indici[um] of ownership of the business assets." Frederiksen v. Poloway, 637 F.2d 1147, 1151-52 (7th Cir. 1981). This application of the "economic reality test" was ultimately referred to as the "sale of business" doctrine, providing that

> under certain circumstances, the transfer of 100 percent of the stock of a corporation incident to the sale of an ongoing business to a purchaser who will manage or direct the management of the business does not constitute the sale of a security within the meaning of the federal securities laws.

Irving P. Seldin, When Stock is Not a Security: The "Sale of Business" Doctrine Under the Federal Securities Laws, 37 Bus. Law. 637, 637-38 (1982).

The United States Supreme Court rejected the "sale of business" doctrine in Landreth and its companion case, Gould v. Ruefenacht, 471 U.S. 701 (1985). The Court reaffirmed its holding from Forman that "the fact that instruments bear the label 'stock' is not of itself sufficient to invoke the coverage of the Acts." Landreth, 471 U.S. at 686. However, if an instrument is called "stock" and bears the usual characteristics of "stock" as identified in Forman, a purchaser would be justified in assuming that federal securities law applies. Id. Therefore,

11

> where an instrument bears the label "stock" and possesses all the characteristics typically associated with stock, a court will not be required to look beyond the character of the instrument to the economic substance of the transaction to determine whether the stock is a "security" within the meaning of the [1933 and 1934] Acts.

Gould, 471 U.S. at 704 (citation omitted).

Although the "sale of business" doctrine is no longer applicable under the federal Acts, there continues to be a split of authority among the states as to whether the doctrine should apply to individual state Securities Acts that define "security" to include "any . . . stock," as the Virginia Securities Act does. Some of the state courts that have followed Landreth have done so because they adopt the reasoning of the United States Supreme Court in that case. See Fong v. Oh, 172 P.3d 499, 508-09 (Haw. 2007); Banton v. Hackney, 557 So.2d 807, 824 (Ala. 1989); Cohen v. William Goldberg & Co., Inc., 423 S.E.2d 231, 232-33 (Ga. 1992). Some courts have done so without explicitly agreeing with the Supreme Court's reasoning, but because the language of the 1933 and 1934 Acts is substantially similar to the wording of the particular state securities statute. Barnes v. Sunderman, 453 N.W.2d 793, 796 (N.D. 1990); Carver v. Blanford, 342

12

S.E.2d 406, 407 (S.C. 1986).[*] These courts apply the "stock characterization test" from Landreth.

Some state courts that have not followed Landreth have done so because they have reasoned that their state legislatures have intended the state securities statutes to cover sales in the securities market, not commercial transactions when a closely held corporation is sold. See White v. Solomon, 732 P.2d 1389, 1391 (N.M. Ct. App. 1986); Doherty v. Kahn, 682 N.E.2d 163, 169-70 (Ill. App. Ct. 1997); Anderson v. Heck, 554 So.2d 695, 700 (La. Ct. App. 1989). These states continue to apply the principle the United States Supreme Court applied in Forman, that "form should be disregarded for substance and the emphasis should be on economic reality." People v. Figueroa, 715 P.2d 680, 694 n.26 (Cal. 1986) (quoting Tcherepnin, 389 U.S. at 336). As such, these states apply the "sale of business" doctrine so that state securities laws do not apply to transactions in which 100% of the stock of a closely held corporation is transferred.

---

[*] One state supreme court has followed Landreth while explicitly disagreeing with the decision. In following Landreth, that court noted that "we are required to coordinate our interpretation of state securities laws with its federal equivalent" under a provision of the state securities statute. Kovatovich v. Barnett, 406 N.W.2d 516, 518 (Minn. 1987).

13

Like many of the states that have either chosen to follow Landreth or not to follow it, our state securities statute defines "security" to include, "unless the context otherwise requires," "any . . . stock." Code § 13.1-501. There are sound policy reasons for following Landreth and rejecting the "sale of business" doctrine. As noted above, the definition of "security" in the Virginia Securities Act derives from the definition of "security" in the 1933 and 1934 Acts. Gibson, 42 Va. L. Rev. at 483. The Virginia Securities Act and the federal Acts "achieve their ends in similar ways." Pollok, 217 Va. at 413, 229 S.E.2d at 860. We have previously held that the Virginia Securities Act should receive "similar construction" as the federal Acts. Id. It is therefore appropriate for the word "stock" as a part of the definition of "security" in the Virginia Securities Act to be interpreted in the same manner as the 1933 and 1934 Acts.

As the United States Supreme Court noted in Landreth, the definition of "security" in the federal Acts is "quite broad." 471 U.S. at 686. "The face of the definition shows that 'stock' is considered to be a 'security' within the meaning of the Acts." Id. Though bearing the label "stock" alone is not sufficient to invoke the coverage of the securities laws, the label does make it more likely that an investor purchasing "stock" would believe he was covered by the securities laws.

14

Id. at 686-87.  When the instrument purchased bears the label "stock" and possesses the characteristics of traditional stock, the purchaser is justified in assuming that the Virginia Securities Act applies.  In such a case, the Virginia Securities Act should apply, regardless of whether control of a business is changing hands.

Additionally, application of the "sale of business" doctrine invites many practical difficulties in determining whether a transaction is regulated by the Virginia Securities Act.  The doctrine presumably applies whenever "control" of a business is sold.  Whether "control" has passed to the purchaser is often difficult to determine.

> Control . . . may not be determined simply by ascertaining what percentage of the company's stock has been purchased.  To be sure, in many cases, acquisition of more than 50% of the voting stock of a corporation effects a transfer of operational control.  In other cases, however, even the ownership of more than 50% may not result in effective control.  In still other cases, de facto operational control may be obtained by the acquisition of less than 50%.  These seemingly inconsistent results stem from the fact that actual control may also depend on such variables as voting rights, veto rights, or requirements for a super-majority vote on issues pertinent to company management, such as may be required by state law or by the company's certificate of incorporation or its bylaws.

Gould, 471 U.S. at 705.  Whether "control" has passed to the purchaser may not be determinable until a court has made a

15

factual determination, which may follow "extensive discovery and litigation." Id. The parties may therefore not know at the time of the transaction whether the transaction is regulated by the Virginia Securities Act.

The determination of whether "control" has passed to a purchaser may also invite absurd results. For example,

> a corporation's stock could be determined to be a security . . . as to some purchasers but not others. Likewise, if the same purchaser bought small amounts of stock through several different transactions, it is possible that the Acts would apply as to some of the transactions but not as to the one that gave him "control."

Id. at 705-06. These potential results are inconsistent with the purpose of the Virginia Securities Act, to "protect[] investors from fraud in the securities markets." Gurley, 674 F.2d at 259; see also Virginia Brewing Co., 167 Va. at 71-72.

For the foregoing reasons, we hold that the "sale of business" doctrine does not apply in Virginia. We therefore apply the Landreth "stock characterization" test to the transaction at issue in this case.

D. Application of the "Stock Characterization" Test

If an instrument "bears the label 'stock' and possesses all of the characteristics typically associated with stock," it is a "security" within the meaning of the Virginia Securities Act. Gould, 471 U.S. at 704. As stated above, the characteristics typically associated with stock are: (1) the

right to receive dividends contingent upon an apportionment of profits; (2) negotiability; (3) ability to be pledged or hypothecated; (4) conferring of voting rights in proportion to the number of shares owned; and (5) ability to appreciate in value. Forman, 421 U.S. at 851.

The trial court erred in holding that the MHCI stock "did not have the indicia of traditional stock." First, there is no dispute that Andrews had a right to receive dividends contingent upon an apportionment of profits. As the owner of the shares of MHCI "stock," Andrews was entitled to receive dividends payable on that stock if any were ever paid.

Second, the MHCI "stock" is negotiable. Although the Purchasers agreed not to sell, transfer, assign, or gift their shares without the Sellers' permission until the Note was satisfied, this was a limitation on the parties by agreement, not a limitation on the instruments themselves. As previously noted, Andrews purchased Pownall's shares of stock in MHCI. For the same reason, the MHCI "stock" has the ability to be pledged or hypothecated. The parties' agreement to hold the instruments in escrow until the Note was satisfied does not change the characteristics of the instruments.

Similarly, the MHCI "stock" conferred voting rights on the Purchasers. The parties placed a limitation in the SPA on the Purchasers' right to vote, such that the Purchasers did

17

not retain the exclusive right to vote the shares if they breached the SPA.  Again, this is a limitation on the parties by the agreement, not a limitation on the instruments.

Finally, it is not disputed that the MHCI "stock" had the ability to appreciate in the future if the value of the business increased.  Because the MHCI "stock" has all the characteristics of traditional stock as outlined in Forman and bears the label "stock," we hold that it is a "security" within the meaning of Code § 13.1-501.  Therefore, the Virginia Securities Act applies to the sale of the MHCI stock in this case.

### III. Conclusion

For the reasons stated, the judgment of the trial court will be reversed and the case remanded for further proceedings.

Reversed and remanded.

18