# CIRCUIT COURT OF THE CITY OF NORFOLK

Jane Doe

v.

Virginia Wesleyan College

v.

Robert Roe

Case No. CL14-6942

By Judge David W. Lannetti

November 9, 2015

Plaintiff Jane Doe, Defendant/Third-Party Plaintiff Virginia Wesleyan College ("VWC"), and Third-Party Defendant Robert Roe appeared before the Court on October 21, 2015, for a hearing (the "Hearing") on various motions filed by the parties, proper notice having been given to all parties. The following motions were filed and noticed: (1) Doe's Motion To Amend Complaint; (2) Doe's Second Motion To Amend Complaint; (3) VWC's Motion for Partial Summary Judgment Regarding the Clery Act; (4) VWC's Motion for Partial Summary Judgment Regarding Charitable Immunity; (5) VWC's Second Motion *in Limine* Regarding Insurance; (6) VWC's Third Motion *in Limine* Regarding Underlying Events; (7) VWC's Fourth

Motion *in Limine* Regarding Collections; (8) VWC's Fifth Motion *in Limine* Regarding Donors; (9) VWC's Sixth Motion *in Limine* Regarding Pseudonyms; (10) VWC's Motion for Protective Order Regarding the Deposition of Robert Barry; (11) Roe's Motion *in Limine* Regarding Administrative Proceedings; and (12) VWC's Motion *in Limine* Regarding Alcohol Consumption.

Now, the Court, after considering the arguments at the Hearing, reviewing the related pre-hearing and post-hearing briefs, and consulting applicable authorities, rules as follows.

## I. *Doe's Motion To Amend Complaint*

Doe seeks to amend her Complaint to add counts for (a) Negligent Hiring of Jerry Mance, Jr., and (b) Negligent Hiring of Troy Katzer. Doe asserts that these claims were in her original Complaint and that the proposed Amended Complaint merely includes additional details about which she became aware through the discovery process. VWC responds that these claims are new and do not arise out of the same transaction or occurrence as that alleged in Doe's original Complaint. VWC also contends that Doe includes allegations within her proposed Amended Complaint that are harassing and/or demeaning, and VWC seeks to ensure those allegations are not included in any Amended Complaint. VWC further asserts that Doe improperly, and without basis, claims recovery of her attorney's fees. The Court denies in part and grants in part Doe's Motion To Amend Complaint.

The Court finds that the count in Doe's proposed Amended Complaint for Negligent Hiring of Jerry Mance, Jr., is a new claim that: (i) is not sufficiently related to the transaction and occurrence alleged in Doe's original Complaint; (ii) would substantially prejudice VWC at this point in the proceedings; and (iii) does not further the ends of justice. *See* Va. Sup. Ct. R. 1:8. The Court therefore denies Doe leave to amend her Complaint to add this new claim.

The Court finds that the count in Doe's proposed Amended Complaint for Negligent Hiring of Troy Katzer, by contrast: (i) is related to the transaction and occurrence alleged in the original Complaint; (ii) does not prejudice VWC at this point in the proceedings; and (iii) does further the ends of justice. *See id.* The Court therefore grants Doe leave to amend her Complaint to add this claim.

The Court finds that the proposed Amended Complaint improperly includes allegations that are harassing and/or demeaning.

Doe's proposed Amended Complaint does not include any language regarding recovery of attorney's fees that is not included in her original Complaint. It, therefore, is improper to resolve Doe's alleged claim for recovery of her attorney's fees pursuant to this motion.

Doe is granted leave to submit to the Court an Amended Complaint within fourteen days that includes her Negligent Hiring of Troy Katzer

claim, although Doe is specifically directed not to include any harassing or demeaning allegations in her Amended Complaint.

## II. *Doe's Second Motion To Amend Complaint*

Doe seeks to amend her Complaint to add counts for (i) Title IX Hostile Environment; (ii) Title IX Deliberate Indifference; and (iii) Intentional Infliction of Emotional Distress. Doe asserts that she became aware of these claims as a result of the discovery process. VWC responds that they are new claims that do not arise out of the same transaction or occurrence and that the introduction of these claims at this point in the proceedings would represent substantial prejudice to VWC. VWC also contends that the new claims are futile as pleaded.

The Court finds that these counts are new claims that: (i) are not sufficiently related to the transaction and occurrence alleged in the original Complaint; (ii) would prejudice VWC at this point in the proceedings; (iii) are futile as pleaded; and (iv) do not further the ends of justice. *See* Va. Sup. Ct. R. 1:8. The Court, therefore, denies Doe leave to amend her Complaint to add these new claims.

## III. *VWC's Motion for Partial Summary Judgment Regarding the Clery Act*

VWC seeks partial summary judgment to dismiss any claims to the extent they are based on VWC's alleged failure to comply with the Clery Act and to preclude Doe from introducing or otherwise referencing VWC's or any other institution's compliance or noncompliance with the Clery Act. Doe responds that she has no intention of introducing any evidence that VWC or any other institution complied or failed to comply with the Clery Act, but argues that the prohibition against evidence related to compliance with the Clery Act does not affect the admissibility of the data contained within the Clery Act reports. At the Hearing, VWC effectively amended its motion to include preclusion of admission of the data contained within the Clery Act reports.

The express language of the Clery Act precludes admission of evidence regarding compliance or noncompliance with the act. 20 U.S.C. § 1092(f) (14)(B). The Court, however, is not aware of any case law precluding admission of data within Clery Act reports, and courts in fact have considered such data in the past. *See, e.g., Lees v. Carthage College*, 714 F.3d 516, 520, 526 (7th Cir. 2013); *James v. Duquesne Univ.*, 936 F. Supp. 2d 618, 626 (W.D. Pa. 2013). The Court therefore grants in part and denies in part VWC's Motion for Partial Summary Judgment Regarding the Clery Act.

To the extent that Doe's claims, including but not limited to its fraud claim, are based on VWC's inaccurate reporting of data in its Clery Act

reports, such claims essentially are claims that VWC did not comply with the Clery Act and, therefore, are dismissed with prejudice. Doe is not precluded, however, from introducing data within Clery Act reports for purposes other than demonstrating compliance or noncompliance with the act, subject to the Virginia Rules of Evidence.

## IV. *VWC's Motion for Partial Summary Judgment Regarding Charitable Immunity*

VWC seeks partial summary judgment by asserting that VWC is entitled to charitable immunity because: (i) VWC's Articles of Incorporation have a charitable or eleemosynary purpose; (ii) VWC operates consistent with that purpose; and (iii) Doe was a beneficiary of VWC at the time of the alleged assault. Doe responds that VWC's Articles of Incorporation do not have a charitable or eleemosynary purpose and, even if they did, VWC does not operate consistent with that purpose. Doe asserts that the issue of whether Doe was a beneficiary is premature, as that analysis is only necessary after it is established that the Articles of Incorporation have a charitable or eleemosynary purpose and that VWC operates consistent with that purpose. VWC and Doe agreed at the Hearing that argument and presentation of evidence regarding whether VWC operates consistent with the expressed charitable or eleemosynary purpose and whether Doe was a beneficiary would be postponed until the scheduled October 22, 2015, Plea in Bar hearing.

The Court finds that, based on its express language, the VWC Articles of Incorporation have a charitable or eleemosynary purpose. The Court, therefore, grants in part VWC's Motion for Partial Summary Judgment Regarding Charitable Immunity to the extent VWC sought a declaration that VWC's Articles of Incorporation state a charitable or eleemosynary purpose. The Court reserves resolution of the remaining issues for the pending Plea in Bar.

## V. *VWC's Second Motion in Limine Regarding Insurance*

VWC seeks to preclude admission of evidence at the Plea in Bar hearing regarding whether VWC carried insurance, claiming that the issue is irrelevant as to whether VWC operates consistent with the charitable or eleemosynary purpose stated in its Articles of Incorporation. Doe responds that the issue of insurance coverage is relevant and that other courts have specifically considered this issue when deciding whether a charitable organization operated consistent with the charitable or eleemosynary purpose stated in its Articles of Incorporation.

The Court holds that the issue of whether VWC had insurance can be considered as one of many factors in the Court's analysis of VWC's

operation. The Court, therefore, denies VWC's Second Motion *in Limine* Regarding Insurance.

## VI. *VWC's Third Motion in Limine Regarding Underlying Events*

At the Hearing, VWC withdrew its Third Motion *in Limine* Regarding Underlying Events.

## VII. *VWC's Fourth Motion in Limine Regarding Collections*

VWC seeks to preclude admission of evidence at the Plea in Bar hearing regarding VWC's collections practices, claiming that the issue is irrelevant as to whether VWC operates consistent with the charitable purpose stated in its Articles of Incorporation. Doe responds that the issue of collections practices is relevant and that other courts specifically have considered this issue when deciding whether a charitable organization operated consistent with the charitable or eleemosynary purpose in its Articles of Incorporation.

The Court holds that the issue of VWC's collections practices can be considered as one of many factors in the Court's analysis of VWC's operation. The Court, therefore, denies VWC's Fourth Motion *in Limine* Regarding Collections.

## VIII. *VWC's Fifth Motion in Limine Regarding Donors*

At the Hearing, VWC withdrew its Fifth Motion *in Limine* Regarding Donors.

## IX. *VWC's Sixth Motion in Limine Regarding Pseudonyms*

At the Hearing, VWC withdrew its Sixth Motion *in Limine* Regarding Pseudonyms.

## X. *VWC's Motion for Protective Order Regarding the Deposition of Robert Barry*

VWC seeks a protective order to preclude the introduction of deposition testimony of Robert Barry, counsel for VWC, claiming that any such testimony would be protected by the attorney-client privilege. Doe responds that VWC's corporate deponent, who already has been deposed, waived any attorney-client privilege between VWC and Barry when the corporate deponent testified without objection that Barry was present while settlement negotiations between Roe and VWC occurred. Doe also contends that the

issue, in any case, is premature, as Doe has not noticed the deposition of Mr. Barry.

The Court holds that the issue is not ripe for resolution by the Court, as Mr. Barry's deposition has not been noticed. The Court, therefore, denies VWC's Motion for Protective Order Regarding the Deposition of Robert Barry.

## XI. *Roe's Motion in Limine*
### *Regarding Administrative Proceedings*

At the Hearing, Roe opted not to argue its Motion *in Limine* Regarding Administrative Proceedings and reserved the right to notice it again for a hearing at some future date.

## XII. *Roe's Motion in Limine*
### *Regarding Alcohol Consumption and Related Discipline*

Roe seeks to preclude the introduction of evidence at trial related to his alleged alcohol consumption and related school discipline. Doe responds that evidence of Roe's historical alcohol consumption and related school discipline are relevant to the issue of Roe's alleged alcohol consumption on the night of the alleged assault. Roe clarified at the Hearing that he is not moving to preclude evidence of Roe's alcohol consumption on the night of the alleged assault on Doe.

The Court finds that, even if such evidence of Roe's historical alcohol consumption and related school discipline were relevant, the probative value of such evidence is substantially outweighed by the danger of undue prejudice. Evidence related to Roe's historical alcohol consumption and related school discipline, therefore, is precluded from admission at trial. The Court, therefore, grants in part and denies in part Roe's Motion *in Limine* Regarding Alcohol Consumption.

### *Conclusion*

For the reasons stated herein, the Court grants in part and denies in part Doe's Motion To Amend Complaint; denies Doe's Second Motion To Amend Complaint; grants in part and denies in part VWC's Motion for Partial Summary Judgment Regarding the Clery Act; grants in part VWC's Motion for Partial Summary Judgment Regarding Charitable Immunity; denies VWC's Second Motion *in Limine* Regarding Insurance; denies VWC's Fourth Motion *in Limine* Regarding Collections; denies VWC's Motion for Protective Order Regarding the Deposition of Robert Barry; and grants in part and denies in part VWC's Motion *in Limine* Regarding Alcohol Consumption. Doe is granted leave to submit an Amended Complaint within fourteen days that includes her Negligent Hiring of Troy Katzer claim, but Doe is specifically directed not to include any harassing

or demeaning allegations within the new claim. Doe is further directed to completely remove any other language in the Amended Complaint consistent with the Court's prior Letter Opinions and pursuant to any orders of the Court.

## December 17, 2015

Today, the Court rules on a plea in bar filed by Defendant Virginia Wesleyan College, which asks the Court to find that VWC qualifies for charitable immunity and can use such immunity to shield it from certain tort claims asserted by VWC's beneficiaries and, specifically, by Plaintiff Jane Doe. Although VWC's Articles of Incorporation ("VWC's Articles") state a charitable or eleemosynary purpose and a presumption that VWC is entitled to charitable immunity, therefore, applies the presumption of immunity has been rebutted. The Court finds that VWC does not operate in accordance with the charitable or eleemosynary purpose expressed in its articles of incorporation. The Court overrules VWC's Plea in Bar and articulates the reasons for its ruling herein.

### *Background*

Doe had recently begun her freshman year as a student at VWC in August 2012. (Corrected First Am. Compl. 2.) Doe alleges that on or about August 24, 2012, (*id.* ¶ 5), she was raped and sexually assaulted by a male student, Third-Party Defendant Robert Roe in a VWC dormitory (*id.* ¶¶ 27-28), and that VWC is liable for the resultant damages (*see generally id.*). Doe alleges that she attended an on-campus party "sponsored" by a VWC-employed orientation peer advisor, where she admits that she consumed alcohol offered to her. (*Id.* ¶¶ 12-13.) The alcohol available at the Party allegedly "was spiked with an agent designed to incapacitate [Doe and others] and render them vulnerable to sexual assault." (*Id.* ¶ 18.) VWC-employed security officers allegedly visited the Party at some point, observed "alcohol available for teenager consumption," and took no action. (*Id.* ¶ 15.) Doe allegedly left the Party with some friends, who were impaired, to help them get to their dormitory rooms safely. (*Id.* ¶ 22.) Doe alleges that Roe followed her and her friends after they left the Party and, once Doe's friends were back in their dormitory rooms, Roe assaulted Doe and "forced her back to his dorm room," where Doe alleges Roe raped and sexually assaulted her. (*Id.* ¶¶ 23-27.) Doe prays for judgment against VWC based on three counts: negligence, gross negligence, and fraud. (*See generally id.*) VWC filed a third-party complaint against Roe seeking indemnity and contribution.

VWC is a private non-stock, non-profit liberal arts college located in Norfolk, Virginia. It was established under the auspices of the Virginia Conference of The Methodist Church and chartered in 1961. (*See generally*

VWC's Articles. A copy of VWC's Articles was admitted as Hearing Exhibit A (Ex. A.).) Although VWC apparently was established with a religious basis, which is reinforced by the college's name, as John Wesley is credited with founding the evangelical movement known as Methodism, VWC has not asserted that any religious purpose forms the basis for its claim of charitable immunity. The college was started through a gift of land valued at approximately $500,000, which was donated by a Virginia Beach family. (Tr. 79.) VWC currently has total assets valued at approximately $150,000,000, sixty percent of which originated as donations or gifts. (*Id.* at 78.)

The college has approximately 1,400 students, each of whom is required to pay annual tuition, fees, and room and board totaling approximately $34,000. (*Id.* at 30, 51.) Students can apply for financial assistance to help offset tuition; all students receive some financial assistance, and seventy percent of the student body receives need-based financial aid that averages $4,000 per student per year. (*Id.* at 86.) Over the years, VWC established and enlarged an endowment,[1] the current value of which is approximately $58,000,000,[2] as a result of gifts and related investment income. (*Id.* at 78.) Any operating account net profit typically is transferred to the endowment at the end of the fiscal year. (*Id.* at 50, 98.) The college is overseen by a volunteer Board of Trustees. (*Id.* at 56.) VWC has officers, including a president and several vice-presidents, who are employed by the college and are compensated. (*Id.* at 88.) The 2014 operating budget was approximately $36,000,000, which includes income from tuition, student fees, and room and board, as well as unrestricted donations and some funds from the endowment. (*Id.* at 99.) Unrestricted donations make up approximately four percent of the operating budget, and endowment funds make up approximately six percent of the operating budget. (*Id.* at 50.)

Based on the evidence presented, the Court understands that the 2014 figures are typical of those over the past several years. The Court, therefore, finds that they are an acceptable proxy for the figures for 2012, the year in which the alleged assault occurred. Additionally, the $36,000,000 is what VWC refers to as "net revenue" because it does not include financial aid awarded to the students.

VWC filed a plea in bar seeking to have the Court find that VWC is entitled to charitable immunity from negligence claims and that Doe was a beneficiary of VWC, thereby precluding Doe from recovering against VWC for her alleged negligence damages. After an opportunity to provide pre-hearing briefs, the parties were before the Court for a hearing on October

---

[1] The endowment is an asset of VWC, and its use, therefore, is subject to VWC's Articles.

[2] The value of the endowment as of mid-2012, around the time of the alleged assault, was $48,640,000. (Ex. B, at 17.)

22, 2015. The Court granted leave for the parties to file additional post-hearing briefs. The facts related to the plea in bar essentially are undisputed.

## Positions of the Parties

### A. *VWC's Plea in Bar*

VWC claims that education is inherently a charitable activity and that, as an educational institution, VWC, therefore, is entitled to charitable immunity under Virginia law. Specifically, it asserts that VWC's Articles express a charitable or eleemosynary purpose, thereby creating a presumption that VWC operates consistent with that purpose. (Plea in Bar 3.) VWC further contends that the presumption of charitable immunity has not been rebutted by Doe based on an evaluation of VWC's operations. (Reply to Mem. in Opp. 2.) VWC argues that VWC's Articles limit the college to a charitable purpose, *i.e.,* education; it is a non-profit organization; any profit it generates is ultimately used for educational purposes; it relies on contributions and donations for a substantial portion of its existence; it is exempt from federal income tax and local real estate tax; it takes into consideration the ability of its students to pay the cost to attend VWC; it has no stockholders or others with an equity stake; and its Board of Trustees consists solely of volunteers. (Plea in Bar 3-9.) VWC further claims that, in addition to its general charitable status, Doe was a beneficiary of VWC's charity, and VWC therefore is immunized from negligence claims brought against it by Doe. (*Id.* at 9-10.) VWC's position is that, in light of its immunity, Doe's negligence claims against the college should be dismissed.

VWC acknowledges that, even if it is entitled to charitable immunity, it nevertheless would not be immunized from liability for gross negligence, negligent hiring, or fraud.

### B. *Doe's Response to VWC's Plea in Bar*

Doe asserts that, although educational institutions once may have been considered charitable organizations, their operations have evolved such that modern colleges and universities operate primarily to make a profit. (Mem. in Opp. 4-5.) She asserts that VWC's Articles do not state a charitable purpose both because education "is not necessarily charitable" and because VWC's Articles allow for "other purposes" that could include non-charitable operations. (*Id.* at 6-7; Supp. Mem. in Opp. 7-8.) She claims that, even if VWC's Articles express a charitable or eleemosynary purpose, the college does not operate consistent with that purpose. (Mem. in Opp. 6.) Specifically, Doe asserts that: although education once may have been a charitable purpose, it no longer is, so VWC's Articles do not limit VWC to a charitable purpose; VWC does not in any significant way provide other services that traditionally are considered charitable; VWC operates with

the intent of earning a profit, and it has in fact made a profit every year for the past twenty years; VWC is not reliant on donations and gifts for its continued existence; although VWC may evaluate each student's financial need, it does not serve those who truly are in need, as charitable institutions usually do; VWC's president and vice-presidents are highly compensated; VWC carries liability insurance for negligence claims, so donated funds of the college will not be used to satisfy tort judgments; and VWC has aggressive debt-collection practices. (*Id.* at 6-10; Supp. Mem. in Opp. 8-14.)

## Legal Standard

A plea in bar presents a distinct issue that, if proven, creates a bar to the plaintiff's right of recovery. *Hilton v. Martin*, 275 Va. 176, 177, 654 S.E.2d 572 (2008). The purpose of a plea in bar is "to narrow the litigation by resolving an issue that will determine whether a plaintiff may proceed to trial on a particular cause of action." *Hawthorne v. VanMarter*, 279 Va. 566, 578, 692 S.E.2d 226, 234 (2010).

The moving party has the burden of proving the dispositive fact raised in a plea in bar. *Tomlin v. McKenzie*, 251 Va. 478, 480, 468 S.E.2d 882, 884 (1996). As with a demurrer, the facts contained within the complaint are considered true for purposes of a plea in bar. *Id.*

Virginia recognizes charitable immunity as a bar to certain tort liability. *Ola v. YMCA of S. Hampton Rds., Inc.*, 270 Va. 550, 555, 621 S.E.2d 70, 72 (2005). To qualify for charitable immunity, an entity first must prove that it was organized with a recognized charitable or eleemosynary purpose and that it operates consistent with that purpose. *Id.* at 556, 621 S.E.2d at 72-73. Second, it must establish that the tort claimant was a beneficiary of the entity at the time of the alleged injury. *Id.* If the entity proves the first condition, there is a rebuttable presumption that the second condition is satisfied as well. *Id.* at 557, 621 S.E.2d at 73. "[W]hether an entity operates as a charity turns on the facts of each case and not on the particular type of institution." *Id.*

## Discussion

The Court has considered the Plea in Bar, related briefs, evidence presented and oral argument at the October 22, 2015, hearing, and applicable authorities. The Court now rules on the plea in bar.

## A. *Virginia Recognizes Charitable Immunity*

Virginia's doctrine of charitable immunity was born out of English case law[1] and has long been recognized in the Commonwealth. *See, e.g., Ettlinger v. Trustees of Randolph-Macon Coll.*, 31 F.2d 869 (4th Cir. 1929) (interpreting Virginia law). The Virginia Supreme Court has justified granting immunity from tort liability to certain charitable organizations because "it is manifestly desirable that they should be encouraged in their good work." *Weston's Adm'x v. Hospital of St. Vincent*, 131 Va. 587, 602, 107 S.E.2d 785, 790 (1921). The doctrine "is grounded in the public policy that the resources of charitable institutions are better used to further the institution's charitable purposes, than to pay tort claims lodged by the charity's beneficiaries." *Ola*, 270 Va. at 555, 621 S.E.2d at 72; see also *Hill v. Leigh Mem. Hosp., Inc.*, 204 Va. 501, 507, 132 S.E.2d 411, 415 (1963) ("If a portion of [the] gifts [of the philanthropic-minded] is diverted to the payment of tort claims, without restriction, the spirit and intent of the gifts are, at once, nullified and that much of the burden is again cast upon the public.").

The *Ettlinger* court, in 1929, noted that other courts had justified immunizing charitable organizations based on one or more of the following theories: (1) donor funds are held in trust for humanity's charitable purposes and may not be diverted to the payment of private tort damages; (2) *respondeat superior* is inapplicable where charitable employee services are for humanity's benefit and not the charitable institution's gain; (3) the value of charitable service to society as a whole outweighs payment of private tort claims to a few individuals; and (4) those who accept charity impliedly agree not to hold the charitable organization liable for injuries they receive. 31 F.2d at 871-72. According to the court, "It is significant that almost without exception the courts, while giving different reasons for the rule, have not hesitated to apply it where the one seeking to enforce liability against a charitable institution is one who has accepted benefits from it." *Id.* at 872.

The *Ettlinger* court also appeared to expressly hold that *all* non-profit educational institutions are entitled to charitable immunity. In *Ettlinger*, the defendant was a non-profit corporation organized by the Methodist Episcopal Church "for the purpose of carrying on the work of education." *Id.* at 870. Although the educational institution acquired its real property through charitable gifts and bequests, and some special rates and loans were available to students, students paid tuition and board. *Id.* The court,

---

[1] Ironically, the English cases upon which early American courts relied to establish the doctrine of charitable immunity ultimately were abrogated in England. *See Adkins v. St. Francis Hosp.*, 149 W. Va. 705, 709, 143 S.E.2d 154, 157 (1965) (discussing the English cases).

relying in part on Blackstone's *Commentaries*, held that non-profit colleges inherently are entitled to charitable immunity.

> "The eleemosynary sort of corporations," says [B]lackstone, "are such as are constituted for the perpetual distributions of the free alms or bounty of the founder of them to such persons as he has directed. Of this are all hospitals for the maintenance of the poor, sick, and impotent and *all colleges, both in our universities and out of them*." It is clear that a corporation is to be deemed eleemosynary or charitable where its property is derived from charitable gifts or bequests and is administered, not for the purpose of gain, but in the interest of humanity; and *an educational institution, established and endowed by private charity, falls clearly within the classification*.

*Id.* at 870 (emphasis added; citation omitted). In fact, some jurisdictions have expressly held that all non-profit educational institutions are entitled to charitable immunity. *See, e.g., O'Connell v. New Jersey*, 795 A.2d 857, 866 (N.J. 2002) (interpreting the applicable New Jersey statute as granting charitable immunity to all public and privately operated non-profit corporations organized exclusively for educational purposes).

The policy supporting charitable immunity stands in stark contrast to another public policy, that those who inflict harm upon others should be held responsible and should be required to compensate injured parties for damages they suffer. Believing that tort liability should trump charitable immunity, many commentators and courts have argued that the rationales Virginia has used to support charitable immunity lack persuasiveness. *See, e.g.,* Carl Tobias, *Reassessing Charitable Immunity in Virginia*, 41 U. Rich. L. Rev. 9 (2006). Refuting the trust fund analogy, they note that most charities are corporations, and parties to a contract typically cannot dictate their tort liability vis-à-vis non-parties to the instrument. *Id.* at 10. In response to the threat that tort claims, including vicarious liability, might bankrupt charities, they point out that institutions must only engage in reasonable behavior, as is expected of any entity; even if reasonable care were too much to request of charities, they argue that the expense of insurance is not. *Id.* As to the waiver and assumption of risk justifications, they argue that these, at best, are fictional and, at worst, eliminate protection for those who need it most. *Id.* Finally, from a practical perspective, jurisdictions that have abrogated charitable immunity have not witnessed the demise of charities.

Emphasizing the importance of holding tortfeasors liable, most jurisdictions have abolished charitable immunity. An argument can be made that, in addition to charitable immunity's questionable foundation, this was due to the evolution of charitable organizations. Traditional charitable institutions provided gratuitous services to those who were unable to pay and derived support primarily from voluntary contributions. *See, e.g.,*

*Adkins v. St. Francis Hosp.*, 149 W. Va. 705, 712, 143 S.E.2d 154, 158-59 (1965). Most modern non-profit organizations, by contrast, arguably are run more like businesses. They neither provide services without charge nor receive the majority of their revenue from donations.

Despite being in the small minority of jurisdictions clinging to the doctrine, the Virginia Supreme Court has repeatedly declared that charitable immunity "is firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State." *Ola,* 270 Va. at 555, 621 S.E.2d at 72 (quoting *Memorial Hosp., Inc. v. Oakes,* 200 Va. 878, 889, 108 S.E.2d 388, 396 (1959)). The Supreme Court, on several occasions, also has declared that it is the province of the legislature, and not the judiciary, to abolish charitable immunity. *See* Barbara Ann Williams, *What Price Hath Charity?*, 28 U. Rich. L. Rev. 953, 953-54 (1994). Although Virginia charitable immunity provides a charitable organization with an absolute defense to negligence claims lodged by its beneficiaries, it does not immunize these entities from negligent hiring and retention claims or from gross negligence or willful and wanton negligence claims. *Ola,* 270 Va. at 556, 621 S.E.2d at 72.

Over time, the scope of organizations qualifying for charitable immunity has narrowed in Virginia. The legislature took action to eliminate certain hospitals from consideration. *See* Va. Code § 8.01-38 (Repl. Vol. 2015) (removing charitable immunity from all hospitals except those that render medical services free of charge). Additionally, more recent court decisions have found by evaluating factors developed by the Virginia Supreme Court over time that some non-profit entities were not charitable in the traditional sense and, therefore, were not immune from tort liability. *See, e.g., Danville Com. Hosp. v. Thompson,* 186 Va. 746, 43 S.E. 882 (1947); *Oakes,* 200 Va. 878, 108 S.E.2d 388; *Purcell v. Mary Washington Hosp.,* 217 Va. 776, 232 S.E.2d 902 (1977), superseded by Va. Code § 8.01-38.

The U.S. District Court for the Western District of Virginia, applying Virginia law, addressed the evolution of charitable immunity in the context of higher educational institutions. *Radosevic v. Virginia Intermont Coll.,* 633 F. Supp. 1084 (W.D. Va. 1986).

> Public policy was clearly the grounds upon which the Fourth Circuit in 1929 in *Ettlinger v. Trustees of Randolph-Macon College,* based its decision. Public policy, however, is not immutable; rather it changes to reflect the sentiments and morals of society. As so aptly put by the district court in *Green v. Connally,* 330 F. Supp. 1150 (D. D.C. 1971), "changes in the courts' conceptions of what is charitable are wrought by changes in moral and ethical precepts generally held, or by

changes in relative values assigned to different and sometimes competing and even conflicting interests of society."

*Radosevic*, 633 F. Supp. at 1087-88 (quoting *Green*, 330 F. Supp. at 1159). Although not binding on this Court, Virginia courts have subsequently cited *Radosevic* approvingly. *See, e.g., Ola v. YMCA of S. Hampton Rds., Inc.*, 65 Va. Cir. 456, 464 (Norfolk 2004), *aff'd* 270 Va. 550 (2005). The Virginia Supreme Court in *Ola* relied on another Virginia federal case, *Davidson v. The Colonial Williamsburg Found.*, 817 F. Supp. 611 (E.D. Va. 1993), which relied heavily on *Radosevic*.

The question, then, is when, "in organized society, the rights of the individual must . . . be subordinated to the public good" and under what circumstances "[i]t is better for the individual to suffer injury without compensation than for the public to be deprived of the benefit of the charity." *Ettlinger*, 31 F.2d at 873. Under Virginia's modern-day charitable-immunity assessment, "whether an entity operates as a charity turns on the facts of each case and not on the particular type of institution." *Ola*, 270 Va. at 557, 621 S.E.2d at 73; *see also Estate of Zabrovskiy v. Beth Shalom Home of Va., Inc.*, 85 Va. Cir. 470, 471-72 (Henrico Cnty. 2012) (summarizing the various types of organizations to which charitable immunity has been applied in Virginia).

> To establish charitable immunity as a bar to tort liability, an entity must prove at least two distinct elements. The absence of either element makes the bar of charitable immunity inapplicable. First, the entity must show it is organized with a recognized charitable purpose and that it operates in fact in accord with that purpose. "In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose. . . ."
>
> Second, assuming the entity has met the foregoing test, it must then establish that the tort claimant was a beneficiary of the charitable institution at the time of the alleged injury.

*Ola*, 270 Va. at 556, 621 S.E.2d at 72-73 (quoting *Davidson v. The Colonial Williamsburg Found.*, 817 F. Supp. 611, 613 (E.D. Va. 1993)).

To evaluate whether the entity was organized with a recognized charitable or eleemosynary purpose, the court reviews the entity's founding documents; if the documents establish such a purpose, a presumption that the entity operates in accordance with that purpose is established. *Id.* at 557, 621 S.E.2d at 73. This presumption can be rebutted, however, if the manner in which the entity actually conducts its affairs is inconsistent with

the stated charitable purpose. *Id.* The factors a court should review when evaluating the entity's conduct include, but are not limited to, the following:

(1) Does the entity's charter limit the entity to a charitable or eleemosynary purpose?

(2) Does the entity's charter contain a not for profit limitation?

(3) Is the entity's financial purpose to break even or earn a profit?

(4) Does the entity in fact earn a profit, and, if so, how often does that occur?

(5) If the entity earns a profit (a surplus beyond expenses) must that be used for a charitable purpose?

(6) Does the entity depend on contributions and donations for a substantial portion of its existence?

(7) Is the entity exempt from federal income tax and/or local real estate tax?

(8) Does the entity's provision of services take into consideration a person's ability to pay for such services?

(9) Does the entity have stockholders or others with an equity stake in its capital?

(10) Are the directors and officers of the entity compensated and, if so, on what basis?

*Id.* (citations omitted). None of these factors by itself are determinative. *Id.*

B. *Although VWC's Articles Express a Recognized Charitable or Eleemosynary Purpose, VWC, Nevertheless, Is Not Entitled to Charitable Immunity*

As discussed *supra*, to establish charitable immunity from tort liability for negligence, an entity must first prove that it is organized with a recognized charitable or eleemosynary purpose and, then, that it actually operates consistent with that purpose. An express charitable or eleemosynary purpose in the entity's founding documents creates a presumption that the entity actually serves that purpose, although that presumption may be rebutted by evidence to the contrary.

1. *VWC's Articles Express a Recognized Charitable or Eleemosynary Purpose*

The first step in determining whether an organization can claim charitable immunity as a bar to tort liability is to establish that the organization's articles of incorporation have a charitable or eleemosynary purpose.

VWC's Articles state that the incorporators are incorporating "a non-profit, *charitable*, educational corporation." (VWC's Articles 1 (emphasis added).) VWC was organized:

[t]o provide and maintain an institution of learning . . . to provide opportunities of higher education to persons of both sexes in the humanities, sciences, fine arts, and Christian culture; and for all other purposes which will encourage and promote the cause of Christian education generally and will extend the influence of science, art, and Christian culture.

(*Id.* ¶ (b)(1).) VWC's Articles further state that:

[VWC] is organized and shall be operated not for profit. It shall have no capital stock and in carrying out the purposes of [VWC] no part of its net income or principal shall inure to the benefit of any private individual, excepting only those employees or others rendering *bona fide* services to [VWC].

(*Id.* ¶ (e).) VWC's Articles also specify that VWC is to have no members. (*Id.* ¶ (c).)

VWC's Articles express that, *inter alia,* VWC's "charitable" purpose is to educate students, promote Christian education generally, and extend the influence of science, art, and Christian culture. In light of this broad mission, VWC arguably can be expected to contribute to the public good and welfare of society. Based on the express language of VWC's Articles, the Court, therefore, finds that they express a charitable or eleemosynary purpose. A rebuttable presumption that VWC operates in accordance with this purpose, therefore, applies.

### 2. *VWC Does Not Operate Consistent with the Charitable or Eleemosynary Purpose Expressed in VWC's Articles*

The presumption that VWC operates consistent with the charitable or eleemosynary purpose stated in VWC's Articles can be rebutted if the manner in which VWC actually conducts its affairs is inconsistent with the stated purpose. To evaluate VWC's conduct, the Court looks to a number of factors that have been recognized by the Virginia Supreme Court. *Ola,* 270 Va. at 557, 621 S.E.2d at 73. As a result of the presumption, Doe has the burden of going forward with evidence to rebut the presumption. Va. Sup. Ct. R. 2:301.

#### a. *Whether VWC's Articles Limit VWC to a Charitable or Eleemosynary Purpose*

Doe claims that VWC's Articles do not limit VWC to a charitable purpose, both because VWC is an educational institution, which she claims "is not necessarily charitable," and because VWC's Articles permit VWC to operate "for all other purposes which will encourage and promote the cause of Christian education generally and will extend the influence of

science, art, and Christian culture." (VWC's Articles 1-2.) Doe claims that such "other purposes" theoretically could include, for instance, "taking its income and supporting a political party or making investments to earn income." (Mem in Opp. 7.) She further points out that VWC's Articles do "not limit the income generated by VWC to inure for the benefit of a corporation or organization" or preclude officers, directors, or trustees from being paid a salary. (*Id.*) VWC's Articles also specifically allow VWC to acquire property and thereby expand its operations. (VWC's Articles 2.)

VWC asserts that "[i]t is well settled in Virginia that educational institutions are charitable organizations for purposes of charitable immunity," citing *Ettlinger*. (Plea in Bar 6.) VWC also points out that VWC's Articles require that VWC have no stockholders and be operated not for profit and that only VWC employees and others rendering *bona fide* services can receive any part of VWC's net income. (*Id.*)

The Court notes that VWC's Articles also require that "[a]ll property, real and personal, of [VWC] shall be held in perpetuity for educational purposes" and, upon any dissolution, "all such property shall pass to the . . . The Methodist Church . . . to be applied to educational purposes." (VWC's Articles 4.) In light of the express language, the Court is satisfied that VWC's Articles limit VWC to the purpose of higher education, which can be a charitable function.

The Virginia Supreme Court has held that, "in order to be charitable . . . an institution must be organized and conducted to perform some service of public good or welfare" and has pointed out that the *"Webster's New Collegiate Dictionary* defines 'charitable' as, 'Liberal in benefactions to the poor; beneficent'." *City of Richmond v. United Givers Fund of Richmond, Henrico & Chesterfield, Inc.*, 205 Va. 432, 436, 137 S.E.2d 876, 879 (1964). The question, then, is whether the provision of higher education by private colleges and universities in modern American society performs some service of public good or welfare.

As discussed *supra*, courts interpreting Virginia law in the early 1900s appeared to take the position that all non-profit educational institutions were entitled to charitable immunity. *Ettlinger*, 31 F.2d at 870. A proper understanding of this judicial declaration requires context. American higher education traditionally was intended and designed to train students to serve the public after graduation.

> What distinguished the American idea of the higher learning from other modern conceptions of the university was not only its essential democracy, but even more its positive dedication to the service of an evolving dynamic, democratic community. To the English concept of the general culture of the educated gentleman and the German concept of scholarly research for its own sake, the American university added another dimension,

namely, that higher education to justify its own existence should seek to serve actively the basic needs of American life.

John S. Brubacher & Willis Rudy, *Higher Education in Transition: A History of American Colleges and Universities*, 1636-1968, 394 (rev. ed. 1968). Consistent with this philosophy, "[a] primary reason for state support to higher education [in the nineteenth century] was to provide 'public goods'." Claudia Goldin & Lawrence F. Katz, *The Shaping of Higher Education: The Formative Years in the United States*, 1890-1940, 13-1 J. Econ. Perspectives 37, 50-51 (Winter 1999).

A fundamental change regarding American higher education occurred in the twentieth century, however. Colleges and universities that had concentrated on training their students to serve the public in the learned professions broadened their curricular offerings amidst a society that was benefiting from a higher standard of living. Brubacher & Ruby, *supra*, at 268.

> But with the larger segment of the population of college age which sought the higher learning came many who were not headed for the professions and who came from homes which held no particular allegiance to the intellectual life. . . . They came, or perhaps better were sent, for whatever social prestige college might bring. They attended because it was the socially accepted thing to do. . . . The change in number and composition of the undergraduate body was soon reflected in a discrepancy between the traditionally stated aims of the college and the ambitions of the new clientele.

*Id.* The *Radosevic* court appeared to recognize this evolution of higher education when, in the context of evaluating educational charitable immunity in 1986, it opined that "[p]ublic policy . . . changes to reflect the sentiments and morals of society." 633 F. Supp. at 1087.

Several Virginia circuit courts subsequently incorporated factors developed by the Virginia Supreme Court into the charitable immunity calculus when looking at private non-profit educational institutions, finding that some of these institutions were not entitled to charitable immunity. *See, e.g., Morgan v. Marymount Univ.*, 18 Va. Cir. 428 (Arlington Cnty. 1990) (finding a private, Catholic, non-profit educational corporation that charged tuition, earned a profit eight out of sixteen years, referred delinquent accounts to collections, and refused transcripts to delinquent students did not operate as a charitable organization); *Johnson v. Church Sch. in Diocese of Va.*, 1988 WL 619123 (Richmond Cir. Ct. Feb. 17, 1988) (finding a private, Episcopal diocesan educational corporation that charged tuition, earned a profit every year, had several financial aid programs, and employed "debt collection practices [that] are far more than one expects from a 'charity'," including

referring delinquent accounts to collections and refusing transcripts to delinquent students, did not operate as a charitable organization); *Costello v. University of Richmond*, 1985 WL 306745 (Richmond Cir. Ct. Jan. 31, 1985) (finding that a private college that charged tuition to a majority of its students, paid 79% of its expenses from tuition payments, had 50% of its student body receive financial aid, generated a profit every year, and pursued aggressive debt-collection practices, including referring delinquent accounts to collections and refusing transcripts to delinquent students, did not operate as a charitable organization); *but see Jordan v. Randolph-Macon Coll.*, CL14000633-00 (Hanover Cnty. Cir. Ct. Mar. 11, 2015) (finding that the college's "athletic program and its weightlifting component operate in furtherance of the College's charitable purpose . . . as an institution of higher education"); *Kegley v. Hanover Acad., Inc.*, 79 Va. Cir. 754 (Hanover 2008) (finding charitable immunity because, *inter alia*, "the organization is fully dependent on the generosity of donors").

Just as this Court has held that the relationship between colleges and their students has changed over time, it also holds that the relationship between non-profit private colleges and society has changed over time. *See Doe v. Virginia Wesleyan Coll.*, 90 Va. Cir. 345, 359 (2015). Because the Court recognizes that private higher educational institutions are not the charitable organizations they were when *Ettlinger* was decided,[1] the Court finds that VWC's purpose of providing higher education to its students, by itself, does not inherently qualify the college for charitable immunity. Rather, the Court finds that each specific educational institution needs to be evaluated on its own merits. Here, VWC is a private non-stock, non-profit corporation founded by The Methodist Church, organized with the general purpose of advancing Christian education and Christian culture and required to hold in perpetuity all property for educational purposes and pass such property to The Methodist Church upon any dissolution.

The Court finds that VWC's Articles, which claim that VWC is charitable, do in fact limit VWC to what the articles describe as the "charitable" purpose of advancing Christian education and Christian culture, which *can* be consistent with an organization that is entitled to charitable immunity. Stated differently, the Court finds that VWC's Articles do not permit any operations that are inherently non-charitable. The Court, nevertheless, finds that, in light of the evidence presented and as discussed more fully below, VWC's operations do not evidence any charitable or eleemosynary purpose apart from educating its students, which will affect the evaluation of, and the weight assigned to, certain charitable factors enumerated in Ola.

---

[1] Significantly, the Ettlinger court relied upon cases that were decided between 1819 and 1906 for the proposition that non-profit higher education was inherently a charitable function.

### b. *Whether VWC's Articles Contain a Not-For-Profit Limitation*

It is undisputed that VWC's Articles contain an express not-for-profit limitation, which is consistent with an organization that is entitled to charitable immunity. (*See* VWC's Articles ¶ (e).) Doe argues, however, that this provision should be given very little weight because VWC in fact has earned a profit every year over the past decade, and "the profit is reinvested and not used for any charitable purpose." (Mem. in Opp. 7.) The issues of whether VWC earns a profit and how any profit is used are discussed in other factors.

### c. *Whether VWC's Financial Purpose Is To Break Even or Earn a Profit*

Doe asserts that VWC is intent on consistently earning a significant annual profit and that VWC, therefore, does not operate as a charity financially. (Supp. Mem. in Opp. 8-9.)

VWC concedes that VWC's financial purpose is to break even or earn a profit. The Virginia Supreme Court has defined profit as "a surplus beyond expenses." *Ola,* 270 Va. at 557, n. 1, 621 S.E.2d at 73, n. 1. It asserts that, "for VWC to continue to exist and perform its charitable purpose, it must break even or earn a surplus." (Reply to Mem. in Opp. 2.) VWC points out that the surplus would not go to the trustees, officers, or any other private individuals; rather, it would be used to further fund VWC's stated educational purpose. (*Id.*) VWC also argues that, if it did not consistently earn a profit, its accreditation would be at risk, and it likely would lose certain federal funding. (*Id.*)

The presence of this factor in the charitable immunity evaluation implies that charities typically operate without the goal of breaking even or earning a profit or, if they do earn a profit, they use it for charitable purposes as evaluated in the next two factors. The fact that most modern higher educational institutions endeavor to be profitable to ensure survivability, support accreditation, and successfully seek federal funding, factors that were emphasized much differently or were nonexistent when the *Ettlinger* decision was handed down, perhaps evidences the *Radosevic* court's observation that the conception of charitability has evolved since 1929. *See Radosevic,* 633 F. Supp. at 1087-88. The Court finds that VWC's financial purpose of earning a profit is inconsistent with an organization that is entitled to charitable immunity.

### d. *Whether VWC in Fact Earns a Profit, and, If So, How Often That Occurs*

It is undisputed that VWC structures its operating budget such that at least a small profit is realized every year. (Tr. 70-72.) VWC, in fact, injects funds from its endowment each year to ensure that the operating

budget shows a profit. (Tr. 50.) It also is undisputed that VWC's average annual operating budget surplus over the past eleven years is approximately $365,000. (*Id.* at 40.) The actual years used for the eleven-year period of average profits are 2004 through 2014. (Tr. 40.) The parties agree that, over the past ten years, VWC has had average annual net realized and unrealized gains on its endowment of approximately $1,534,000 and average annual long-term investment endowment income of approximately $714,800. (Supp. Mem. in Opp. 11; Tr. 48.) The actual years used for the ten-year period of average net realized and unrealized gains and average long-term investment income are 2004 through 2013. (*Id.* at 44-47.) Doe characterizes this revenue collectively as "in excess of $2.5 million a year in profit" and claims that it is inconsistent with an operating charity. (Supp. Mem. in Opp. 9-10.)

The presence of this factor in the immunity analysis implies that it is unusual for a charitable organization to consistently earn a profit. Here, VWC structures its finances to ensure it realizes a profit every year. The Court finds that VWC earning a profit every year for the past twenty years is inconsistent with an organization that is entitled to charitable immunity.

### e. *Whether VWC's Profit Must Be Used for a Charitable Purpose*

Doe asserts that, because virtually all of VWC's profit is retained or reinvested to promote the college's educational purpose and that education in and of itself is no longer charitable, VWC's profit is not being used for a charitable purpose. (*Id.* at 11.) Doe points out that only $110,000 of VWC's operating budget, or .03 percent, is used for direct community service, a recognized charitable function. (Tr. 114.)

VWC claims that all of VWC's profit is used for the charitable purpose of education, whether through expansion of facilities or simply growing the VWC endowment as an investment for future use. (Plea in Bar 6-7.) VWC concedes that only a very small amount is used each year for direct community service work, but maintains that higher education itself is inherently charitable. (Tr. 134-36.)

The Virginia Supreme Court has pointed out that, although a charitable organization has an operational surplus in some years, "the important consideration is whether any profit or surplus is used to further the charitable purpose of the organization." *Ola,* 270 Va. at 562, 621 S.E.2d at 76. The Supreme Court previously had held that "the test which determines whether [an entity] is charitable or otherwise is its purpose, that is, whether or not it is maintained for gain, profit, or advantage." *Danville,* 186 Va. at 752, 43 S.E.2d at 884.

Here, VWC's charter generally limits the use of any assets, including profits, to educational purposes. If education were inherently charitable or eleemosynary, there would be little doubt that VWC's profit is used for a charitable purpose. As indicated *supra,* the Court finds that the provision

of higher education, by itself, does not inherently qualify as a charitable or eleemosynary purpose. The evidence indicates that VWC uses the bulk of its earned profit each year to grow its endowment, which currently is valued at approximately $58,000,000. (Tr. 78.) Although VWC claims that significant donated and invested funds are used to expand its educational facilities, such expenditures typically are not recognized as charitable in and of themselves. *See Danville*, 186 Va. at 751, 43 S.E.2d at 884 (implying that one of the hospital's purposes, to buy and own real estate for hospital purposes, was a factor that made it "clear that [the hospital] was not a charitable institution").

Based on the evidence presented, VWC does not expend significant funds on non-educational charitable purposes, such as services to the poor or needy in society. VWC has a "community services department," but its annual budget is only $110,000 of a $36,000,000 total annual net operating budget. (Tr. 90, 114.) There is a full-time employee whose job is to recruit and coordinate volunteers for community service. (*Id.* at 90-91.) Such services apparently include tutoring local elementary school children, preparing meals for the local food bank, feeding and housing the homeless, and working with the elderly. The community service work is not a requirement of the school, and approximately 60 percent of the student body participates in these activities, some for credit and some on a purely volunteer basis. (Tr. 91-96.) However, this is no different from arrangements at many for-profit organizations. Further, many of the volunteer opportunities apparently are available in the form of internships, where students pay to earn credit for volunteering. (*Id.* at 100-03.) The internship credit revenue arguably offsets the expense of the existence of the community services department, although no evidence was offered to determine whether the revenue fully funds the department or earns a profit for VWC.

In sum, VWC arguably uses its profits simply to ensure its own continued existence. Of course, most charities primarily are concerned with their own survival, in order to continue to perform their charitable mission. Unlike charities that provide direct social welfare services to the public at a reduced fee or at no charge, however, most modern private non-profit colleges and universities, including VWC, provide no charitable or eleemosynary services apart from educating their students. Based on the evidence presented, the Court finds that the tie between educated VWC students and some concomitant "service of public good or welfare" is too remote and tenuous to constitute charity. *United Givers Fund*, 205 Va. at 436, 137 S.E.2d at 879. The Court, therefore, finds that the use of VWC's profit is not for a charitable purpose and, therefore, is inconsistent with an organization that is entitled to charitable immunity.

### f. *Whether VWC Depends on Contributions and Donations for a Substantial Portion of Its Existence*

Doe points out that approximately ninety percent of VWC's operating budget is funded by student tuition, room and board, and student fees and that only four percent of VWC's budget is funded by donations. (Mem. in Opp. 12.) VWC's tuition apparently is comparable to that of other similar private colleges and universities. (Tr. 30.) Although Doe agrees that six percent of the budget is funded by endowment investment income, she claims that these funds should not be viewed as donations. (Tr. 16.)

VWC asserts that ten percent of its operating budget comes from new donations or income from prior donations, four percent from direct donations and six percent from endowment investment income, which stemmed from investment of prior donations. (Reply to Mem. in Opp. 2.) Even under this argument, the average $365,000 annual surplus, about one percent of the annual operating budget, properly can be viewed as an offset to "donations" to the operating budget, making the total "donated" funds approximately nine percent of the annual operating budget. VWC also claims that approximately sixty percent of its current assets originated from donative gifts. (*Id.*) VWC asserts that virtually all of its approximately $58,000,000 current endowment came directly or indirectly from gifts made to VWC and that the endowment accounts for about 42.57 percent of VWC's total assets. (Plea in Bar 7.) VWC points out that it received, on average, $5.68 million per year in contributions and grants between 2003 and 2012. (Plea in Bar 7.)

As pointed out, VWC's endowment, which is one of the college's assets, has had an average of $1,534,000 in annual gains and an average of $714,800 in annual investment income over the past ten years. (Supp. Mem. in Opp. 11; Tr. 48.) When combined with the average net profit of $365,000 from the annual operating budget, VWC almost is self-sufficient without any annual donations or gifts.

The Court recognizes that, depending on the endowment gains and investment income in any given year, portions of the endowment corpus might need to be used to balance the budget at times.

VWC undoubtedly is correct that an entity could not continue to exist if it consistently accumulated debt. The Court finds, however, that it would be highly unusual for an entity entitled to charitable immunity to accumulate significant profit year after year; rather, it is more likely that a charitable organization would in most cases operate at a loss absent charitable contributions. As the Virginia Supreme Court has opined, "[t]he public policy behind the doctrine of charitable immunity admits the necessity of public and private contributions to carry on the organization's charitable purpose." *Ola,* 270 Va. at 562, 621 S.E.2d at 76. Here, VWC operates at a significant profit without significant reliance on charitable contributions.

The Court understands VWC's argument that it relies on over $2,000,000, six percent of its $36,000,000 operating budget, each year from its endowment in order to balance its operating budget. The Court also notes that the endowment, to a large extent, consists of net profit and investment proceeds from prior years, in addition to direct contributions to the endowment over time. Nevertheless, it is clear that, by virtue of the current state of the endowment, VWC could survive many years with no new charitable contributions.

At most, ten percent of VWC's annual operating budget comes from new and past donations. This is far less than that of other organizations that have been granted charitable immunity in recent history. *See, e.g., Davidson,* 817 F. Supp. at 615 (denying charitable immunity and noting that, although not dispositive, "only 8% of the [organization's] operating income came from donations and gifts"); *Ola,* 270 Va. at 562, 621 S.E.2d at 76 (granting charitable immunity in part because 29% of the entity's revenues came from the public as donated funds, which represented "a significant factor of charitable operation").

The Virginia Supreme Court has held that "the receipt of a minimal amount of an entity's total revenue as a charitable donation may augur against a finding that it operates in fact as a charity." *Ola,* 270 Va. at 562, 621 S.E.2d at 76. Significantly, the twenty-nine percent of revenue from donations considered in Ola was comprised of "funds that are donated to the YMCA rather than earned by the YMCA." The Court finds it noteworthy that here, on average, only approximately four percent of VWC's annual operating budget comes from funds that are donated to VWC. The Court further finds that this small percentage represents "a minimal amount" and not "a substantial portion of its existence" as required by Ola and that this minimal amount "augur[s] against a finding that [VWC] operates in fact as a charity." *Ola,* 270 Va. at 562, 621 S.E.2d at 76. The Court, therefore, finds that VWC's lack of dependence on contributions and donations for a substantial portion of its existence is inconsistent with an organization entitled to charitable immunity.

### g. *Whether VWC Is Exempt from Federal Income Tax and/or Local Real Estate Tax*

It is undisputed that VWC is exempt from federal income tax and local real estate tax. Doe properly points out that this factor, like all factors, is not dispositive. (Mem. in Opp. 7.) As the *Radosevic* court noted:

> It is highly unlikely that the standards used by the taxing authorities to classify an organization as being tax exempt are interchangeable with those applied by the courts in determining immunity from tort liability for organizations. The public policy behind tax liability and tort liability is

inherently dissimilar; therefore, the standards applied in imposing liability in each body of law cannot be interchanged.

*Radosevic*, 633 F. Supp. at 1086, n. 1.

The Court finds that VWC's tax-exempt status is consistent with an organization that is entitled to charitable immunity, but the Court places little weight on this factor.

### h. *Whether VWC's Provision of Services Takes into Consideration a Person's Ability To Pay for Such Services*

As an initial matter, VWC's tuition is comparable to other private colleges and universities. (Tr. 30.) Doe points out that, although VWC claims it awards over $10 million in need-based and merit-based scholarships each year, any merit-based scholarship funds are irrelevant to the charitable immunity analysis, as is any federal or state funding provided to students. (Mem. in Opp. 8.) Doe also points out that VWC does not take into consideration a person's ability to pay for purposes of debt collection, as the college's policy is to seek collection of every debt, including referring collections to a professional debt-collection agency if VWC's informal collection procedure is unsuccessful. (Supp. Mem. in Opp. 13.)

VWC asserts that approximately seventy percent of VWC's students receive need-based financial aid from VWC, with an average of $4,000 per year per student. (Reply to Mem. in Opp. 3.) The Court notes that, for these students, on average, this equates to less than twelve percent of their $34,000 annual total cost to attend VWC. According to VWC, it provides approximately $10.51 million in need-based and merit-based aid annually, which comes from "its endowment, investment income, charitable gifts, and other sources of income." (Plea in Bar 7.) If *every* student receives some financial assistance directly from VWC, a cogent argument can be made that the advertised tuition fee is artificially inflated by the lowest amount of financial assistance provided. Additionally, only need-based financial aid is relevant to the charitable immunity analysis. Although VWC also apparently attempts to assist its students with application for federal and state grants, the Court does not find this relevant to the charitable immunity analysis.

The Court recognizes that the majority of VWC's students receive need-based financial aid, but finds that the average amount of aid, less than twelve percent, is relatively small. Further, no evidence was presented that any students receive significantly more than the $4,000 average amount, *e.g.,* that a student receives the majority of his or her total annual assessed costs via financial aid. The Court also finds that VWC's debt-collection practices are inconsistent with those of an organization entitled to charitable immunity, as discussed *infra*. Overall, the Court finds that VWC does not adequately consider its students' ability to pay for services and, therefore,

finds that its procedures are inconsistent with an organization that is entitled to charitable immunity.

   i. *Whether VWC Has Stockholders or Others with an Equity Stake in Its Capital*

It is undisputed that VWC has no stockholders or others who hold an equity stake in the college. Doe argues that this is greatly mitigated by both the fact that VWC's trustees *could* be compensated, although they are not, and the fact that VWC's officers "are compensated at a handsome rate." (Mem. in Opp. 9.)

Even assuming, *arguendo*, that VWC's trustees were paid and VWC's officers were compensated handsomely, no evidence was presented that any of these individuals are equity stakeholders of the college. *Cf. University of Va. Health Servs. Found. v. Morris*, 275 Va. 319, 337-39, 657 S.E.2d 512, 521 (2008) (denying charitable immunity in part because the entity's "incentive payment structure is functionally a profit-based bonus system, much like a for-profit enterprise"). The Court, therefore, finds that VWC's arrangement is consistent with an organization that is entitled to charitable immunity. The impact of the compensation amounts of VWC's officers is discussed under the next factor.

   j. *Whether VWC's Directors and Officers Are Compensated and, If So, on What Basis*

Doe alleges that VWC's President was one of the highest compensated private non-profit college presidents in Virginia in 2011, receiving $377,156 in compensation that year. (Supp. Mem. in Opp. 12.) Although Doe asserts that VWC's President was the ninth-highest paid president of a Virginia private non-profit college in 2011, no evidence was introduced to support this assertion. Doe also notes that the President's salary increased by more than fifty percent over the past ten years, apparently due to the college's success during that time period. (Tr. 29.) Doe further alleges that the other VWC officers "are paid a very competitive rate" and that they "are not paid as if they work for a charity, but a highly successful business." (Mem. in Opp. 9.)

VWC contends that the VWC Executive Committee sets a competitive salary for VWC's President based on a review of salaries paid to other private college presidents in Virginia and that VWC's President then evaluates and sets the salaries of other college officers based on, *inter alia,* salaries set by "comparable institutions." (Plea in Bar 8-9.) According to VWC, "If VWC did not pay its President and officers a competitive salary, VWC would not be able to attract and retain the high quality personnel necessary to fulfill its stated educational purpose." (*Id.* at 9.)

VWC's directors, called trustees, are community volunteers who are not paid. (Tr. 56.) Although VWC's Articles do not expressly preclude payment to the trustees, the undisputed testimony is that they have never been paid. (*Id.* at 86, 133.) The officers, as VWC employs that term, are not officers of the Board of Trustees or of a board of directors but rather are VWC employees tasked with full-time VWC responsibilities. (*Id.* at 88.) The only officer who meets with the Board of Trustees on a regular basis is VWC's President, who is a non-voting *ex-officio* trustee. (*Id.* at 144.) It is undisputed that VWC's President was one of the most highly compensated college or university presidents in the Commonwealth and that the 2013 compensation of the school vice-presidents range between $137,087 and $170,737, which is competitive with other private colleges and universities in Virginia. (*Id.* at 57.)

The Court understands this factor of the charitable immunity analysis to be focusing primarily on compensation for *non-employees* of the entity. The Court therefore agrees with VWC that "notwithstanding his title, [VWC's President] was not an officer or director of VWC" for purposes of charitable immunity. (Reply to Mem. in Opp. 4.) Further, although it appears that a certain amount of the President's compensation might be discretionary based on his performance — and presumably on the success of VWC, including its financial performance — no evidence was presented that his compensation structure is incentive-based or tied directly to the profit of VWC such that it would be analogous to a stockholder or member distribution. The Court, therefore, finds that VWC's compensation of its directors and officers, although arguably high, is consistent with that of an organization entitled to charitable immunity.

### k. *Whether Other Factors Apply to the Analysis of Whether VWC Operates Consistently with Its Charitable or Eleemosynary Purpose*

In addition to the factors enumerated in *Ola,* the Virginia Supreme Court in the past has looked to other factors when evaluating charitable immunity, including (1) whether the entity seeking immunity had liability insurance and (2) the debt-collection practices of the entity. An organization's debt-collection practices alternatively could be evaluated as part of the analysis regarding whether VWC's provision of services takes into consideration a person's ability to pay for such services. The Court, nevertheless, elects to address them separately, as that is how the issue was presented by the parties. Doe asserts that both of these factors reinforce that VWC does not operate as a charitable organization.

### i. *Whether VWC Maintained Liability Insurance*

It is undisputed that VWC carried liability insurance that might cover some tort judgments. (Tr. 64.) Doe points out that Virginia courts have

considered in their charitable immunity calculus whether an entity carries liability insurance. *See, e.g., Radosevic,* 633 F. Supp. at 1088 (noting that the *Costello* court "took into account the presence of liability insurance" and "apparently believed that it would not be against public policy to allow a student of the university to sue for damages for injuries sustained on campus in light of the university's liability insurance coverage"). Doe argues that, because VWC carries insurance, holding VWC liable for its negligence would not siphon donated funds from VWC and, therefore, would not dilute any charitable purpose of the college. (Mem. in Opp. 9-10.)

VWC asserts that whether a college carries liability insurance is irrelevant to any charitable immunity analysis. (Tr. 21.)

The Virginia Supreme Court has expressly held that "a charitable organization may carry liability insurance and retain its charitable immunity." *Ola,* 270 Va. at 561, 621 S.E.2d at 75. The Court finds that, even if an entity were confident that it would qualify for charitable immunity, it still likely would carry liability insurance to cover, *inter alia,* torts not under the umbrella of charitable immunity or torts involving non-beneficiaries. As the *Ola* court noted, "it is often prudent and an exercise of fiduciary responsibility for a charitable entity to carry liability insurance for protection in the appropriate circumstance." *Id.*

The Court, therefore, places no weight on this factor.

### ii. *VWC's Debt-Collection Practices*

Doe asserts that VWC's debt-collection practices are not consistent with how a charitable organization operates. (Mem. in Opp. 8.) She claims that VWC attempts to collect 100% of its student debts and that "VWC aggressively pursues 99% of its debt regardless of the person's ability to pay and regardless of the person's situation," electing to forgo only the debt it deems uncollectible. (*Id.*) According to Doe, VWC's record "belies its claims that it is a benevolent entity seeking to bestow the charity of education upon its students." (Supp. Mem. in Opp. 13.) Doe points out that the following is undisputed: (1) VWC initiates collections procedures against its students in all cases of nonpayment of tuition, class fees, and room and board fees; (2) once internal debt-collection efforts are unsuccessful and VWC refers an account to a professional debt-collection agency, an additional thirty-three percent finance fee is added; (3) VWC pursues collection regardless of the reasons for a student's non-payment or departure from the college; (4) over the past ten years, VWC has collected approximately $2,000,000 and has forgiven only $21,000, or approximately one percent, which was deemed to be uncollectible; and (5), until the debt is paid in full, VWC withholds the student's transcript. (*Id.*)

VWC maintains that its debt-collection policy is "necessary to ensure VWC remains able to carry out its charitable purpose." (Reply to Mem. in Opp. 3.) VWC claims that, because it takes into account each student's

ability to pay when it awards need-based financial aid, VWC understands what students can, and agree to, pay. VWC claims that it tries to work with individual students through reminders, formal letters, and no-interest payment plans before turning a matter over to an outside debt-collection agency. It asserts that any finance fee is a charge by the third-party collection agency and not a penalty assessed by VWC. (*Id.*)

The Virginia Supreme Court, when analyzing charitable immunity, has looked to an organization's debt-collection practices, ostensibly acknowledging that charitable entities, which exist for the benefit of the needy and societal welfare generally, are inclined to forgive debt from those to whom they have provided services. *See, e.g., Morris*, 275 Va. at 336, 657 S.E.2d at 520 (denying charitable immunity in part based on an aggressive debt-collection policy); *Purcell*, 217 Va. at 781, 232 S.E.2d at 905 (denying charitable immunity in part based on "an aggressive and vigorous effort to collect for its services"); *Oakes*, 200 Va. at 882, 108 S.E.2d at 391 (granting charitable immunity in part based on a liberal debt-collection policy).

The Court finds that VWC's debt-collection practices are more aggressive than organizations typically entitled to charitable immunity. VWC admits that it attempts to collect all student debt and that it forgives only debt it concludes is uncollectible. Similar to other colleges and universities, it also withholds a student's transcript if that student owes money to the college. The Court does not find persuasive VWC's argument that, because it considers a student's financial need when the student applies to the college, there is no need to assess that student's financial status upon a failure to pay a debt. Perhaps, because a person's financial status is dynamic, most charities evaluate financial need both when a client applies for services and *again* when he or she accrues a debt for services provided. *See, e.g., Oakes*, 200 Va. at 882, 108 S.E.2d at 391. In sum, the Court finds that VWC's debt-collection practices are inconsistent with an organization entitled to charitable immunity.

### 1. *Summary of VWC's Operations*

At least one jurisdiction has statutorily granted charitable immunity to all non-profit educational organizations. *See O'Connell*, 795 A.2d at 866 (interpreting New Jersey law). Virginia clearly has not taken such a broad approach. If anything, Virginia has tended to incrementally restrict granting such immunity. *See* Va. Code § 8.01-38; *see also Radosevic*, 633 F. Supp. at 1089 (finding that "the public policy in Virginia favors a more restrictive approach to determining that an institution is immune from tort liability on the grounds of the charitable immunity doctrine"); *Ola*, 270 Va. at 556, 621 S.E.2d at 72 (pointing out that "Virginia has favored a *limited* form of charitable immunity" (emphasis added)). Virginia appellate courts, in fact, have not addressed the issue of non-profit educational charitable immunity directly. Federal courts interpreting Virginia law have found that

the application of charitable immunity to educational organizations has evolved during the twentieth century, and there are recent Virginia circuit court opinions that have found that charitable immunity applies to some educational institutions but not others.

The Court agrees with the *Radosevic* court that the public benefit and social welfare provided by the provision of education has evolved since the advent of the twentieth century. Providing education no longer is inherently charitable. Although using donations to meet the higher educational needs of individuals undoubtedly has merit, unless a demonstrable service of public good or welfare is transferred to society as a result of that education, the educational institution is not satisfying a charitable or eleemosynary purpose. As a result and by applying the *Ola* factors with this in mind, most modern private colleges and universities likely will not qualify for charitable immunity. This is not to say that it is impossible for a private college or university to qualify for charitable immunity. The Virginia Supreme Court has made clear that the charitable immunity analysis is to be conducted on a case-by-case basis. *Ola,* 270 Va. at 557, 621 S.E.2d at 73.

The Court does not view its interpretation that providing education, without a corresponding benefit to society, is not a charitable purpose to be a constriction of the current body of Virginia charitable immunity law, but rather sees it as consistent with *Radosevic* and the application of the charitable immunity factors enumerated by the Virginia Supreme Court in *Ola.* Even if most modern private higher educational institutions will not be able to qualify for charitable immunity, there still is a panoply of organizations that will be able to qualify, and in fact have qualified in the past; these include the YMCA, churches, organizations assisting the handicapped, and medical institutions providing indigent care, to name a few. *See Zabrovskiy,* 85 Va. Cir. at 471-72 (citing examples).

Although VWC was founded by The Methodist Church with the help of significant donations, there is little to distinguish VWC's operations from those of other private higher educational institutions.

The Court finds that the following aspects of VWC's operations are *consistent* with the operations of an organization entitled to charitable immunity: (1) VWC's Articles express a charitable or eleemosynary purpose, thereby creating a presumption that VWC operates consistently with that purpose; (2) VWC's Articles limit the college to what could be a charitable purpose, *i.e.,* the advancement of Christian education and Christian culture; (3) VWC's Articles contain a not-for-profit limitation; (4) VWC is exempt from federal income tax and local real estate tax; (5) VWC has no stockholders or others with an equity stake in the college; and (6) VWC's directors and officers are not compensated.

However, the Court finds that the following aspects of VWC's operations are *not consistent* with the operations of an organization entitled to charitable immunity: (1) VWC's financial purpose is to earn a profit, and it in fact has

earned a profit every year for the past twenty years; (2), although profits must be used for educational purposes, no evidence was presented that VWC's provision of education results in a demonstrable service of public good or welfare to society, so VWC's profits are not used for a charitable or eleemosynary purpose; (3) VWC does not depend on contributions and donations for a substantial portion of its existence; (4) VWC's provision of services does not significantly take into consideration its students' ability to pay for such services; and (5) VWC engages in aggressive debt-collection practices.

VWC actually operates very much like the college in *Radosevic. See* 633 F. Supp. 1084. Similar to VWC, the college in *Radosevic* had the following characteristics: it was a non-stock, non-profit private institution; its charter allowed it broad control of real and personal property; it had a volunteer Board of Trustees; its officers received salaries; it received charitable contributions that helped defray the educational expenses of its students; all students paid tuition; some students received tuition discounts; no students received a free education; it filed numerous suits to collect student debts; it showed a profit in nine of the past fifteen years; it could not provide the same level of educational support without charitable contributions; and it carried liability insurance. *Id.* at 1088-89. In light of these operational characteristics, the court found that the "manner of operation of the college [was not] strictly charitable in nature." *Id.* at 1089. Here, the Court similarly finds that VWC's operations are not strictly charitable in nature.

As noted, the presence or absence of any of the Ola factors is not determinative. *Ola,* 270 Va. at 557, 621 S.E.2d at 73. Nor does the Court apply equal weight to each factor. In sum, the Court finds that VWC operates like most other private colleges and universities, including the college at issue in the *Radosevic* case. No evidence was presented that the provision of education by VWC, a profitable private college with substantial assets and a sizable endowment whose student body does not significantly benefit the public directly prior to or after graduation, advances the public good or social welfare in the way that non-educational traditional charities do. Similarly, no evidence was presented that the average VWC student recipient of need-based financial aid, who still pays approximately $30,000 per year to attend college and who will be subject to aggressive debt-collection actions should he or she be unable to pay, is a true recipient of charity.

Under the facts presented here, the Court finds that VWC does not operate consistent with the charitable or eleemosynary purpose stated in its articles of incorporation. Doe has successfully rebutted the presumption that VWC's operations are consistent with its founding documents, and the Court, therefore, finds that VWC does not qualify for charitable immunity.

C. *The Court Does Not Need To Address Whether Doe Was a Beneficiary of VWC at the Time of the Alleged Assault*

Because the Court finds that VWC is not entitled to charitable immunity, there is no need to evaluate whether Doe was a beneficiary of VWC for charitable immunity purposes.

## Conclusion

The Court overrules VWC's Plea in Bar.